## ROGERS, Respondent, vs. McCUNE, Appellant.

1. What is a proper precautionary measure in itself, uninfluenced by rule, usage or custom, to avoid collisions of steamboats, is a question of law. Signals by bells are not, as a matter of law, without regard to usage or custom, a proper measure of precaution.

2. It is no error to refuse an instruction based upon a state of facts of which there is no evidence, or the principle of which is embodied in another instruction given.

3. The declarations of the master of a boat, after a collision, as to how it occurred, are not admissible against the owner.

4. The supreme court will not reverse a cause because a leading question was permitted to be asked a witness.

36—VOL. XIX.

*Appeal from St. Louis Court of Common Pleas.*

This was an action brought by Rogers, to recover damages for the sinking of the steamboat Archer, of which he was owner, by a collision with the steamboat Die Vernon, of which the defendant was part owner. The issue made by the pleadings was, whether the collision was occasioned by the negligence of the officers and crew of the Die Vernon or of the Archer.

The collision occurred about one o'clock in the morning of November 27, 1851, at a point in the Mississippi river, a few miles above the mouth of the Illinois, opposite the upper part of Enterprize island, and just above the head of Roy's island. Enterprize island is on the Missouri side of the river, and its head is about 100 or 150 yards above the head of Roy's island, which is on the Illinois side. The river between these two islands was all channel. Opposite the head of Enterprize island was a sand-bar, making out from the head of Roy's island and the Illinois shore, the western point of which was about sixty yards from the head of Enterprize island. This was known in this case as the upper bar. The collision occurred between this bar and Enterprize island. The Die Vernon, which was the descending boat, ran into the Archer, the ascending boat, striking her quartering, a little forward of the cylinder timbers, and cutting into her larboard side as far as the kelson. The Archer sank immediately, and about thirty-five of her passengers and crew were killed or drowned. The night was dark and hazy, and there was no moon. There was conflicting evidence as to the position of the Archer when she was struck. The plaintiff's witnesses located her near the shore or upper bar. The defendant's witnesses located her nearer to the centre of the channel. The pilot of the Die Vernon, who was on watch, testified that, as the Die was making the crossing above the sand-bar, he saw the lights on the Archer, and supposed that she was on the Missouri shore, near Enterprize island. When he reached the head of Enterprize island and straightened down, he still supposed that the Archer was on the Missouri

Rogers *v.* McCune.

shore, and he tapped the bell of the Die Vernon twice, to sig-
nify that she would go down the Illinois side. As he bore
away in this direction, he heard cries on the Archer, and then
it seemed to him as if the Archer had left the Missouri shore,
and was running across the bows of the Die Vernon. He rung
the stopping bell of the Die Vernon, and thought the engines
were stopped two hundred feet from the Archer, but the Die
soon struck the Archer and sunk her. He stated that he
worked the engines of the Die Vernon slow from the head of
Enterprize island ; that if he had supposed the Archer was on
the Illinois shore, he would have tapped the bell once, and have
run down the Missouri shore, but as it was, he would have run
the way he did, whether he had rung the bell or not. The
pilot of the Archer testified that he did not hear the signal bells
of the Die Vernon. He stated that the Archer was running
along the shore of Roy's island, when the lights of the Die
Vernon were seen about two miles ahead ; that the Archer pro-
ceeded along the shore of Roy's island and the bar, until the
Die Vernon got down to the crossing above the bar ; that, as
the Die was making the crossing, he attempted to give the sig-
nal of four taps of the bell, when he found the bell would not
ring ; he then turned the Archer more directly towards the bar,
and called down through the speaking trumpet for the mate to
come and clear the bell rope. The mate came and attempted
to clear the bell rope, but failed. In the mean time, the Die
Vernon came to the head of Enterprize island, and straighten-
ing down, appeared to run a short distance in the usual course,
but gradually swung around, until at the distance of two hun-
dred yards, she pointed directly towards the Archer. The
mate and pilot of the Archer became alarmed, and began to
halloo as loud as they could. The Die, however, kept on un-
til she struck the Archer. The headway of the Archer by this
time was nearly gone, and she was very near to the bar. The
Archer was much the smaller boat, having an average speed of
about four miles an hour up stream. The Die Vernon had an
average speed of from sixteen to twenty miles an hour down

stream, when under headway.　The Archer was nearly a total loss.　The Die Vernon was not injured.

The defendant read in evidence the following rules, established by the Upper Mississippi river pilots' association, in 1847, and afterwards, as was testified, generally, though not always, observed:

1. The boat descending shall keep the channel, in all cases.

2. The ascending boat shall keep the shore or upper bar, as the case may be.

3. In case of two boats meeting at the point of a bar, the ascending boat shall stop her engine until the other boat has passed.

4. In case of two boats meeting in a chute, the boat ascending shall stop her engine, and drop in shore; the boat descending shall work slow until she has passed the other boat.

5. No boat descending in the night, in high water, shall run the chutes, under any pretence whatever.

6. In foggy or dark nights, the boat ascending (in case of meeting another) shall stop her engines and tap her bell four times; the boat descending shall then tap her bell once, if she wishes to run to the starboard, or twice, if she goes to the larboard, to signify to the ascending boat which side she wants to run.

7. Boats on the rapids to be governed by the same rules, excepting in the chains; there, if a boat be discovered descending, the ascending boat shall stop below the chain until the other has passed, provided it is not in such a place that both can pass in safety.

8. No boat shall be permitted to lock another.

9. In case of two boats ascending or descending, the one ahead shall give the other half the channel, so that the fastest boat can pass.

10. In Fever river, Grand river and Platte river, each boat to keep to the right of the other.

11. All pilots are obliged to give the signals of the bell in the day as well as in the night time, as in article 6.

Witnesses for the plaintiff testified that, by the customs of the river above St. Louis, for a quarter of a century, the ascending boat was bound to keep the shore or upper bar, as the case might be, and the descending boat was bound to keep the channel in all cases. They stated that the custom of signalling introduced in 1847, did not alter the old custom, but that the boats were bound to give the signals in accordance with the old custom; that the object of the signals was, to make the pilots feel certain that they understood each other, and that the descending boat never had the right, by signal, to take away the upper bar from the ascending boat. On the other hand, there was evidence that the descending vessel had the right, by signal, in all cases, to take choice of sides. There was evidence tending to show that, if the ascending boat did not give a signal, the descending boat could, by usage, give the first signal, and also evidence that, if no signal was given by the ascending boat, the descending boat had no right to signal at all. There was evidence that the descending boat had no right to run according to signal, unless it was answered by the ascending boat. On the other hand, witnesses for the defendant testified that it was the duty of the descending boat to run according to her signal, until danger was seen. One witness stated that it was the duty of the ascending boat to give the descending boat the upper bar, if she signals for it, unless the ascending boat signals otherwise. There was evidence that, independent of signals, the Archer was in the proper place for an ascending boat, and the Die Vernon not in the proper place for a descending boat, and *vice versa.*

Thomas Taylor, a witness, whose deposition was taken by the respondent, was asked the following question:

"Is there any custom of the river authorizing the descending vessel, in the night time, to leave the main channel, for the purpose of taking the upper bar away from the ascending boat, as far as you know?"

This question was objected to as leading when the deposition

was taken, but the answer of the witness, to the effect that he knew of no such custom, was permitted to be read at the trial, the defendant excepting.

Florent Meline, a witness whose deposition was taken by the respondent, speaking of the value of the Archer, said: " For the purpose of a ferry boat, I considered her worth $10,000, judging from the price asked for other boats not so good." This was objected to by the defendant, but admitted. The statement of the same witness, as to the cost of repairs on the Archer, before the collision, was permitted to go the jury, the defendant excepting. His only knowledge of the cost of the repairs was derived from " bills that passed through his hands." One of the items of the repairs was $3,200, of which the witness said: " the bill is mislaid; I set it down from recollection ; I cannot swear it is correct."

The defendant offered to prove that, immediately after the collision, and as soon as Captain Rogers, the master of the Archer, had got aboard the Die Vernon, he stated in the social hall of the Die Vernon, that the collision was entirely owing to the foul condition of the Archer's bell, and no blame attached to the Die Vernon, her officers or crew. This evidence was excluded, and the defendant excepted. Captain Rogers died a few days after the collision.

The court, of its own motion, gave the following, among other instructions :

8. If the jury believe from the evidence that, by the custom of the Upper Mississippi river navigation, in regard to steamboats, at the time of collision, the Archer was in the proper place for an ascending vessel, and that, at the time of collision, the Die Vernon was not in her proper place as a descending vessel, and that the exercise of reasonable skill, on the part of the pilot and officers of the Die Vernon, would have avoided the collision, and that no act was done by the pilot or officers of the Archer, to mislead the pilot or officers of the Die Vernon, or to produce the collision, and that the off cers and pilot of the

Archer exercised reasonable skill on their part to avoid the collision, then the jury are authorized to find for the plaintiff; and in such case, the measure of damages is the value of the Archer at the time of the collision, and the jury may allow interest thereon from the time of bringing this suit; but the defendant is entitled to have deducted from the value of the boat so lost, the amount that plaintiff realized from the saving of the wreck.

At the instance of the defendant, the following, among other instructions, were given:

11. If the jury find, when the Archer first discovered danger of a collision with the Die Vernon, the said Archer did not use all ordinary and reasonable means in her power to prevent it, they must find for the defendant; or if the negligence of the Archer, in any manner, contributed to the collision, directly or substantially, they must find for defendant.

13. If the jury believe that, in November, 1851, it was the usual and established custom of the Upper Mississippi to give signals by bells where boats met in the night, and the descending boat, after being hailed by the ascending boat giving four taps of the bell, should then indicate which side she would pass, and if the jury believe such custom was known to the officers and agents of the plaintiff, who were managing the steamboat Archer at the time of the collision, and if the jury also find that the Archer, being the ascending boat, gave no signal by bell, and that the descending boat gave a signal, by two taps of the bell at the usual distance, indicating an intention to pass between the Archer and the Illinois island or shore, and if they also find that the collision occurred by reason of the omission, on the Archer, to give any signal, and to obey those given by the Die Vernon, they will find for the defendant. They are also instructed that, whether the omission to give or answer signals by bell, on the Archer, was the result of carelessness or misfortune, would not change the result, if said omission contributed, directly or substantially, to produce the collision.

All the instructions in this cause are to be considered together, as containing the rules of law applicable thereto.

The following instructions asked by the defendant, were refused :

9. If the jury believe that a signal was given by the Die Vernon to the Archer, indicating where the Die V. would run, and that this was in conformity to the custom in the river at the time, and that the collision would not have happened save for a failure on the part of the Archer to comply with or respond to this signal, they will find for the defendant.

14. If the collision complained of was caused wholly or in part by the want of care, skill and foresight in the servants or agents of the plaintiff, in the navigation of the steamboat Archer, the plaintiff is not entitled to recover.

15. If the jury believe from the evidence, that there was carelessness and omissions of duty on the part of those engaged in the navigation of both the boats which came in collision, no action can be maintained by either against the other.

Instructions, numbered $7\frac{1}{2}$ and 8, were asked by the defendant and refused, the purport of which is stated in the opinion of the court.

There was a verdict and judgment for the plaintiff, from which the defendant appealed.

*Glover & Richardson, Haight & Shepley*, for appellant, among others, argued the following points : 1. The court erred in refusing the 8th instruction asked by the appellant. Nothing is clearer, on the score of authority, than that, if a collision is attributable to any act of omission or commission by the plaintiff, there can be no recovery. The refusal of that instruction is equivalent to a declaration that the Archer had the right to invite the Die Vernon to direct her course into a certain part of the channel, pledging herself to bear away ; and yet, when the invitation is accepted, and the Die Vernon runs accordingly, the act is unjustifiable, and she is responsible for consequences. When it is seen that signalling by bells is presented by the instruction as *the measure* used for the pre-

vention of collision, the error of refusing it becomes still more
manifest.    The Archer has then neglected the only means us-
ually employed to insure safety.    In 6 Wheaton's Rep. 311,
and Angell on Carriers, 323, it is laid down that a vessel, to
be without fault, must do whatever is customary to avoid col-
lision.    2. The court erred in refusing the instruction asked
by the appellant, numbered 7½.    The court was here asked to
say, without reference to custom, that, if the Archer did neg-
lect to observe an ordinary and proper means of safety, that
would constitute a *prima facie* case of neglect at least.    But
the court says no.    The Archer had the right to disregard
those precautions of safety which were in ordinary and com-
mon use by boatmen to ensure safety, and the fact raises no
imputation against her.    This certainly must be error.    Blatch-
ford C. C. R. 363.    Ib. 237.    4 Harr. 232.    Daviess, 361.
1 Howard (U. S.) 29.    6 Whart. 323.    10 Howard (U. S.)
579, 585.    19 Wend. 401.    2 Wend. 10.    Abbott on Ship-
ping, 300.    3 Kent, 230.    Apply these authorities to this
case, and the plaintiff's cause of action is utterly destroyed.
The court below refused to give any instruction which imputed
fault to the Archer, in not having a sufficient bell to return a
signal, or in not returning a signal given her.    The court re-
quired the appellant to show that the collision was caused by
this conduct on the part of the Archer, whereas it was the duty
of the Archer to show that it was not.    If this doctrine is cor-
rect, a boat may neglect to carry lights, or competent pilots—
may dispense with a rudder or a wheel, and still she may stand
a very good chance to avoid all responsibility; for the other
party may not be able to show, in point of fact, that any of
these things did really cause the collision.

 *B. A. Hill* and *T. Polk*, for respondent.    It is contended
by the defendant, with more ingenuity than soundness, that the
court below was bound to declare that the failure to give the
bell signal is to be held as *prima facie* evidence of negligence
on the part of the Archer.    To this it may be answered, 1st.
That the court below was not asked to declare any such rule of

law. 2d. The court could not declare that the failure to signal by bells was *prima facie* evidence of negligence, unless a custom of signalling by bells was found, nor unless such custom had some influence upon the running of boats, and gave the descending boat the choice of sides. These facts are negatived by the finding of the jury, which is sustained by evidence. 3d. The thirteenth instruction declares the failure to give the signals, under the conditions which must necessarily be annexed to any such instruction, to be not only *prima facie* evidence of negligence on the part of the Archer, *but a bar to a recovery* by the plaintiff, and that, too, without regard to the question whether proper means of precaution were used by the Die Vernon or not. This was laying down the rule as favorably for the defendant as he could ask, and more favorably than the law warrants; for it is obvious that no neglect of one boat can authorize a reckless disregard of her safety by the other. Each boat must be prudently run, according to the necessities of the case. No arbitrary rule can be laid down to authorize any recklessness. The defendant could have had no advantage before the jury by the declaration of a *prima facie* case of negligence, that he did not get under the 13th instruction as a bar to the recovery. The 8th instruction asked by defendant and refused is covered, so far as it is applicable to anything in this case, by the 12th and 13th instructions given. In support of the instructions given, the following authorities are referred to. Angell on Carriers, §643, 644, 650. Mary Stewart, 2 W. Rob. Rep. 244. The Massachusetts, 1 W. Rob. 71. The Volcano, 2 W. Rob. 337. *Lecombe* v. *Wood*, 2 M. & Rob. Rep. 290. 21 Pick. 254. 1 Camp. 515. 1 How. U. S. Rep. 89. 2 W. Rob. 201. 3 Carr. & Payne, 528. 9 ib.

Scott, Judge, delivered the opinion of the court.

This being a case in which there is a verdict, our task is limited to the examination of the instructions given and refused, and to the points of evidence raised on the trial. Although the rules by which we are governed restrain us from inquiring into

the correctness of the verdict on the mere facts, yet we cannot suppress the opinion that there is ample evidence in the record to sustain the finding of the jury.

Upon the whole case, the custom in regard to signals by bells was made, by the instructions given for the defence, to assume a greater importance than it merited. Although there was evidence which warranted the hypothesis contained in the defendant's instructions, in relation to the custom of giving signals by bells, yet the weight of the testimony, if credited by the jury, was sufficient to show that the custom had no great deal to do with the case. The rules, as adopted by the association of pilots of the Upper Mississippi, where this collision occurred, and as explained, tend to support this view.

1. The chief objection to the action of the court below is, the refusal of the instruction numbered $7\frac{1}{2}$, asked by the defendant. The purport of that instruction was that, if the jury find, at the time of collision, the giving of signals by bells was an ordinary and proper precaution to avoid collision, and the Archer attempted to pass the Die Vernon without employing such a measure, after having received the proper signals from the Die Vernon, she running according to the signals she had given, and otherwise conducting herself with due care, then the burden of proof is on the plaintiff, to show that the collision was not caused by her neglect, and that such omission in no wise contributed to it.

The defendant, in his brief, remarks upon this instruction, " that the court was here asked to say, without reference to custom, that if the Archer did neglect to observe an ordinary and proper means of safety, that would constitute a *prima facie* case of neglect at least."

If the instruction, numbered $7\frac{1}{2}$, had, as was supposed, merely asked a declaration from the court, that the giving of signals by bells was a proper precautionary measure to avoid collisions, whatever might have been said of it in other respects, it would have avoided the objection that it submitted a

question of law to the jury. The instruction is not as it was conceived to be. It does not refer to the court the question, whether the giving of signals by bells was a proper measure of precaution to avoid collisions, but it is asked to be put to the jury ; and in this consists the error of this instruction. What is a proper precautionary measure in itself, uninfluenced by rule, usage, or custom, to avoid collisions, is a question of law. Chancellor Kent says : " There are settled nautical rules by which, in most cases, the want of skill or care or duty may be ascertained." 3, 230. But, as a matter of law, the instruction was wrong. For no signals by bells could be an ordinary and proper measure of precaution for avoiding steamboat collisions, without regard to usage or custom. Such a thing would be impossible. How could a court tell a jury that there should be one, two or four taps of a bell given by this or that boat, without there was a usage ? How could it say what one, two or four taps indicated, unless the thing had been previously regulated by rule or custom. Indeed, if the instruction contemplated that signals by bells was an ordinary and proper precaution for avoiding collisions, without regard to the rule or custom, it had no foundation in the facts of the case. As a means of avoiding collisions, signals by bells were never used until 1847, after the adoption of rules by the association of pilots of the Upper Mississippi, by which they were introduced.

2. There was no error in refusing the 8th instruction asked by the defendant, to the purport that if the custom of the river of giving signals by bells was the measure used for preventing collisions, and the Die Vernon, in proper time and manner and in good faith, gave signals to the Archer that she would pass to the larboard, and otherwise conducted herself with ordinary care and diligence, and the Archer neglected to respond by signal, and the custom in such case implied that the Archer assented to the signal of the Die Vernon, the Die Vernon was justified in running according to her signal, so long as she saw

no danger, even though the Archer was unable to respond. There is no evidence in the record which warrants the assumption that the ascending boat assents to the signal of the descending boat, if she does not respond to it. The strongest expression by any witness, in relation to this matter, is, "the duty of the ascending boat is, to give the descending boat the upper bar, if she signals for it, unless the ascending boat signals otherwise." The principle of this instruction moreover, was embodied in a previous one, which had been given for the defendant. The same proposition ought not to be repeated in several instructions, as it serves to give it an undue weight with the jury.

As instructions numbered 11 and 13 had been given for the defendant, there was no error in refusing that numbered 9. Instructions numbered 14 and 15 had been previously given, in substance.

The instruction given for the plaintiff, numbered 8, standing alone, would have been open to objections, but when considered along with those given for the defendant, it cannot be regarded as erroneous, especially as the jury was directed to take all the instructions together, as forming the law of the case.

3. There was no error in excluding the declarations of the captain of the Archer as to the cause of the collision. He was no party to the suit, nor owner of the boat. His declarations could not be regarded as a part of the *res gestæ*. They were not made until after the transaction was past. The admission or declaration of his agent binds the principal only when it is made during the continuance of the agency, in regard to a transaction then depending. It is admissible, because it is a verbal act and part of the *res gestæ*. What the captain said after the collision had taken place, was a recital of the cause of it, and was no part of the transaction whilst it was passing.

4. This court will not reverse a judgment because a leading question has been put to a witness during the trial of the cause. What is a leading question is a matter depending so much upon circumstances, that no rule can be framed on such a subject.

We all know men who may be safely examined as witnesses by leading questions. If a judgment was reversed for such a cause, would not a willing witness be sufficiently instructed at a future trial to serve the party who brought him.

The witness, Meline, was examined as to the value of the steamboat Archer. Surely there was nothing in his deposition that could prejudice the defendant with an intelligent jury. They would only give it such weight as it was entitled to, from the manner in which he spoke. If it was open to comment, it might have been made to the jury. There was other evidence on this point.

The other judges concurring, the judgment is affirmed.