Cynthia BYNOTE, Respondent,

v.

**NATIONAL SUPER MARKETS, INC., Appellant.**

No. 76902.

Supreme Court of Missouri, En Banc.

Jan. 24, 1995.

Ann E. Hamilton, St. Louis, for appellant.

Michael Gross, David M. Nissenholtz, St. Louis, for respondent.

ROBERTSON, Judge.

We granted transfer in this case to consider whether the contents of a conversation between employees of a defendant business, overheard by an injured invitee immediately after a slip and fall, are admissible to establish defendant's knowledge of a dangerous condition. The trial court admitted the evidence of the employees' statements and the jury returned a verdict for the plaintiff.

The Court of Appeals, Eastern District, concluded that the plaintiff's testimony was inadmissible hearsay, held that the plaintiff failed to make a submissible case, and reversed the judgment of the trial court. We have jurisdiction. Mo. Const. art. V, § 10. For the reasons that follow, the judgment of the trial court is affirmed.

I.

On February 12, 1989, Cynthia Bynote, the plaintiff, entered one of defendant's ["National"] National Super Market stores. She picked up a few grocery items. Near the checkout counter, she slipped and fell on a puddle of liquid on the floor, suffering inju-

ries. Bynote testified that she sat on the floor for two or three minutes after her fall trying to gather herself. A uniformed grocery bagger, whom she recognized from previous shopping visits, asked if she was okay. Bynote replied, "Oh, well, I guess." Then a female checker came around from the cash register and, according to Bynote, said to the bagger, "I told you to get that water up." The bagger replied, "I did." "Well," the checker said, "I can see the suds from here." Bynote testified that the bagger walked away and the checker returned to her cash register. Neither assisted Bynote, who remained on the floor. Bynote testified that when she finally returned to her feet, she could see water on the floor where she had fallen, and noticed that the palms of her hands and the seat of her pants were wet. She paid for her groceries and left without reporting the slip and fall to the assistant manager on duty.

Bynote reported the fall to the defendant's store manager a day or two after the incident, when her pain worsened. The manager contacted the assistant manager who was on duty the night of the fall. The assistant manager disavowed any knowledge of Bynote's accident.

The manager testified that any employee could direct a bagger to clean up liquid on the floor of the store and that a bagger was required to attend to such spills. Neither the bagger nor the checker were deposed or testified at trial. Prior to trial, National filed a motion in limine, seeking to exclude Bynote's testimony as to the statements of the bagger and checker. The trial court overruled the motion. At trial, over National's objection, the court admitted Bynote's testimony concerning the employees' statements.

## II.

### A.

National assigns error to the trial court's failure to sustain its motion for a directed verdict. That motion asserted that Bynote failed to make a submissible case because (1) Bynote's testimony concerning statements of National's employees was not admissible, and (2) without that testimony, Bynote could not show that "defendant knew or by using ordinary care should have known of the condition." *Luthy v. Denny's, Inc.,* 782 S.W.2d 661, 663 (Mo.App.1989); *accord* MAI 22.03 (1989).

■ Bynote offered the statements of the bagger and checker as evidence of National's actual knowledge of the condition. Actual knowledge of a dangerous condition is shown if "an agent or employee [of the defendant] knew of the dangerous condition." *Taylor v. F.W. Woolworth Co.,* 592 S.W.2d 210, 211 (Mo.App.1979); *accord Hunt v. National Super Markets, Inc.,* 809 S.W.2d 157, 159 (Mo.App.1991); *Vinson v. National Super Markets, Inc.,* 621 S.W.2d 373, 375 (Mo.App. 1981); *McIntyre v. M. & K. Department Store, Inc.,* 435 S.W.2d 737, 740–41 (Mo.App. 1968). There was no other evidence of actual or constructive knowledge of a dangerous condition by National. Thus, this case is submissible *only if* Bynote's testimony concerning statements of the checker and bagger is admissible to show that National, through its agents, knew of the dangerous condition prior to the fall.

National urges that the testimony is inadmissible hearsay. Bynote argues that the testimony is admissible as state of mind testimony or under the excited utterance or admission of party-opponent exceptions to the hearsay rule. From a review of the record, it appears that the trial court admitted the statements under the excited-utterance exception to the hearsay rule.

### B.

■ When a witness offers the out-of-court statements of another to prove the truth of the matter asserted in the statement, the testimony is hearsay. Generally, courts exclude hearsay because the out-of-court statement is not subject to cross-examination, is not offered under oath, and is not subject to the fact finder's ability to judge demeanor at the time the statement is made. However, exceptions to the general prohibition against hearsay may apply when circumstances conspire to assure the trustworthiness of the declarant's statement despite the absence of cross-examination, the oath, and the fact finder's ability to observe the declarant's demeanor.

■ The parties make free use of the term *"res gestae"* in their briefs to describe the exceptions to the hearsay rule. The phrase is virtually meaningless in determining what a trial court means when it permits testimony on the basis of the *"res gestae"* exception to the hearsay rule. In *State v. Williams*, 673 S.W.2d 32, 34 n. 1 (Mo. banc 1984), this Court quoted with approval from 6 Wigmore, Evidence § 1767 (Chadbourne rev. 1976):

> [T]he phrase res gestae has long been not only entirely useless, but even positively harmful. It is useless, because every rule of evidence to which it has ever been applied exists as a part of some other well-established principle and can be explained in the terms of that principle. It is harmful, because by its ambiguity it invites the confusion of one rule with another and thus creates uncertainty as to the limitations of both.

*"Res gestae"* is not synonymous with its specific subcategories—present sense impression, excited utterance, then existing mental, emotional, or physical condition and various forms of nonhearsay. The use of the term *"res gestae"* in arguing for the admission of out-of-court, third-party statements failed to clarify the specific current category of the hearsay rule exception sufficiently for a trial court to understand the evidentiary standard the party invokes. Therefore, we will no longer recognize the phrase *"res gestae"* as carrying sufficient meaning to support either the admission of or an objection to proffered testimony.

Our review proceeds, then, to determine whether the trial court's admission of defendant's employees' statements comports with specifically identified exceptions to the hearsay rule or is admissible for some other reason. The parties do identify, either in opposition or support, several possible bases for admission of the statements of the bagger and checker: (1) state of mind; (2) excited utterance; and (3) admission by a party-opponent.

### 1.

### State of Mind

In this case we are concerned with "state of mind" testimony introduced to show that the defendant, through its agents, had notice of the existence of a liquid on the floor. Generally, testimony concerning notice falls within two categories: statements of the declarant and statements of one who hears the declarant. Both are present in this case.

■ Where the statement of which the witness testifies is that of the declarant— here testimony by Bynote that the checker said that she had told the bagger to clean up the water—the testimony is admissible only if it meets time and place criteria. Because the testimony is offered to show notice, the statement that is the subject of the testimony must be made prior to the slip and fall.

No one can know another's mental processes; a relevant statement of condition prior to the incident, however, is an outward manifestation of what the declarant knew prior to the fall. Since the issue for which the evidence is offered is the defendant's awareness of the dangerous condition prior to injury, courts permit the admission of the statement out of necessity. That the statement also contains elements of hearsay is outweighed by the ability of the statement to reveal the declarant's state of mind.

■ In this case, the checker's statements showing notice, as well as those of the bagger, were made after the fact. They fail the time and place requirements for state of mind testimony and were not admissible under the state of mind exception to the hearsay rule.

■ Where the issue is what the defendant's agents heard—the second category— state of mind testimony is not offered to show the truth of the statements made. Instead, it is offered to show the fact that the statements, whether true or false, were made to defendant and, as a result, defendant had notice of a potentially dangerous condition prior to any injury. State of mind testimony in this category is not admitted as an exception to the hearsay rule. It is admitted because it is not hearsay.

In *Vinyard v. Vinyard Funeral Home, Inc.*, 435 S.W.2d 392, 396 (Mo.App.1968), the court found that complaints received by the defendant about the parking lot pavement

being slippery when wet on a date **prior to** the plaintiff's injury were admissible to show knowledge by the defendant of the propensity of the parking lot to become slippery when wet. The rationale supporting admission of the evidence was that the complaints showed defendant's knowledge of the slippery condition at some time prior to the incident **sub judice**. *Id.* The statements did not show the existence of the dangerous condition at the time of plaintiff's fall and were not admitted for that purpose. *Id.*

■ When a statement showing knowledge is made, as here, **after** the slip and fall, it is not admissible as non-hearsay. *Hunt v. National Super Markets, Inc.*, 809 S.W.2d 157, 159 (Mo.App.1991). This is because the only way the trier of fact can decide whether the defendant knew of the dangerous condition **before** the slip and fall is to conclude that the out-of-court declarant's after-the-fact statement concerning the existence of the condition prior to the incident is true. *Id.* at 160. The statement is, therefore, offered to prove the truth of the matter asserted. It is hearsay testimony and thus inadmissible.

## 2.

## Excited Utterance

■ From the record, it appears that the trial court admitted the statements under scrutiny as excited utterances. The excited utterance exception to the hearsay rule depends on a "startling or unusual occurrence sufficient to overcome normal reflection [such that] the ensuing declaration [is] a spontaneous reaction to the startling event." *Jones v. Wahlic*, 667 S.W.2d 729, 730 (Mo.App.1984) (*citing Wren v. St. Louis Public Service Co.*, 333 S.W.2d 92, 94–95 (Mo.1960)).

■ Courts have determined that excited utterances are inherently trustworthy because the startling nature of the event is "speaking through the person instead of the person speaking about the event." *Sconce v. Jones*, 343 Mo. 362, 121 S.W.2d 777, 782 (1938); *accord Roush v. Alkire Truck Lines, Inc.*, 299 S.W.2d 518, 522 (Mo.1957). Because the statement is spontaneous and made under the influence of events, the statement is assumed trustworthy because it is unadorned by thoughtful reflection. *Sconce*, 121 S.W.2d at 781; *Hamilton v. Missouri Petroleum Products Co.*, 438 S.W.2d 197, 200 (Mo. 1969).

Among the factors to be considered [in determining whether an excited utterance exists] are [1] the time between the startling event and the declaration, [2] whether the declaration is in response to a question, [3] whether the declaration is self-serving, and [4] the declarant's physical and mental condition at the time of the declaration. While no one factor necessarily results in automatic exclusion, all should be considered in determining whether the declaration was the result of reflective thought. *Jones*, 667 S.W.2d at 731. The burden of showing that the statement is an excited utterance is on the party offering it. *Hamilton*, 438 S.W.2d at 200; *Gough v. General Box Co.*, 302 S.W.2d 884, 889 (Mo.1957); *Roush*, 299 S.W.2d at 522; *Sconce*, 121 S.W.2d at 782.

■ Applying the *Jones* factors, we can infer from the record that (1) the checker's statement to the bagger and the bagger's response occurred in close temporal proximity to Bynote's fall. There is no evidence, however, that either of National's employees witnessed the actual slip and fall, only Bynote's position on the floor; (2) neither the checker nor the bagger responded to a question; (3) both the checker and the bagger offered statements intended to serve their own purposes. The statement of the checker was not spontaneous; it served to deflect responsibility for the condition of the floor toward another employee. The bagger merely responded to the checker's accusation. He did not respond to the excitement of the event. The checker's further response continued the accusation; (4) finally, there is no indication that either of the declarants— the bagger or the checker—suffered any physical jeopardy from Bynote's fall or were mentally excited as a result of it. Indeed, once each had had a say about the manner in which he or she fulfilled his or her duties, each returned to his or her duties, leaving the customer sprawled on the floor. These were not the actions of persons reacting in an

excited manner to a startling event involving potential injury to a third party.

■ There is another reason to reject a conclusion that the evidence falls under the excited utterance exception. The statements of the bagger and the checker were not about the subject matter of the slip and fall, but about cleaning up liquid on the floor. Thus, even if the statements were excited, they were excited about something other than the slip and fall. *See Straughan v. Asher*, 372 S.W.2d 489, 496 (Mo.App.1963) (To qualify as an excited utterance "the statement must disclose something done, seen or heard by the speaker in the course of the accident.")

We hold, therefore, that the statements of National's employees were not excited utterances within the meaning of that exception to the hearsay rule. The trial court erred in admitting the statements on the basis of the excited utterance exception.

■ This does not end the inquiry, however. If any valid basis existed for the admission of the statements, defendant suffered no prejudice from the error and the trial court's judgment will not be disturbed. *Pike v. Pike*, 609 S.W.2d 397, 403 (Mo. banc 1980); *Sampson v. Missouri Pacific Railroad Co.*, 560 S.W.2d 573, 586 (Mo. banc 1978).

### 3.

### Admission by a Party–Opponent

Bynote argues that her testimony is admissible as an admission by a party-opponent. Courts allow testimony of admissions by party-opponents because the party objecting is, in effect, objecting to a statement it previously authorized by the establishment of an agency relationship with the declarant.

The trial court determined that National's employees' statements did not fall under the admission by a party-opponent exception because neither the bagger nor the checker held an executive position within defendant's company. *See Schultz v. Webster Groves Presbyterian Church*, 726 S.W.2d 491, 497 (Mo.App.1987).

To determine how *Schultz* came to require executive capacity as a condition for admitting testimony of an admission by a party-

opponent, we must begin with *Rogers v. McCune*, 19 Mo. 557 (1854). *Rogers* states that "[t]he admission or declaration of [an] agent binds the principle only when it is made during the continuance of the agency, in regard to a transaction then depending." *Id.* at 569. Under *Rogers*, then, it is the existence and scope of the declarant's agency that determines admissibility, not whether the person has broad management or executive responsibility.

The first case to articulate an "executive capacity requirement" cited *Rogers* and, in keeping with the precedent, held that

> a *narrative statement* by an employee of *past events* is not admissible against the employer unless the admissions are made within the scope of the employee's employment; and to be within the scope of his duties, the employee usually must have some *executive capacity.*

[Emphasis added.] *Missouri State Highway Commission v. Howard Construction Co.*, 612 S.W.2d 23, 26 (Mo.App.1981).

In 1987, the cases took the executive capacity language of *Howard Construction* on divergent paths. In *Gary Surdyke Yamaha, Inc., v. Donelson*, 743 S.W.2d 522, 523 (Mo. App.1987), the plaintiff and defendant each owned motorcycle shops. The plaintiff owned one; the defendant owned three. *Id.* at 523–24. Defendant placed coupon advertisements in a newspaper with circulation in the area in which plaintiff conducted his business. *Id.* at 524. Plaintiff responded by lowering the price of his motorcycles to the coupon price defendant advertised and sued defendant, claiming that defendant designed its advertising with the predatory intent of driving plaintiff from business. *Id.* At trial, plaintiff offered the statements of defendant's salesmen purporting to show defendant's predatory intent. *Id.* The trial court excluded the evidence. *Id.*

On appeal, the plaintiff contended that the statements fell under the admission by a party-opponent exception to the hearsay rule. *Id.* The court of appeals stated that plaintiff "failed to show the salesmen had authority to make the statement in question.... There was no showing that the salesmen took part

in any advertising or marketing decisions nor was there a showing they were executives or acted in an executive capacity." *Id. Surdyke Yamaha* is consistent with *Rogers.* It limits admissibility of party-opponent admissions to the scope of the declarant's agency.

In *Schultz,* 726 S.W.2d at 493, the plaintiff slipped and fell while attending church services. A church janitor arrived after the fall, saw the plaintiff and said, "Oh, I guess I'm too late." *Id.* The trial court refused to permit testimony concerning the janitor's statement. *Id.* The court of appeals affirmed, holding that the janitor's statement did not qualify as an admission of the janitor's employer. *Id.* at 497. The court said, "[t]o be within the scope of his duties, the employee usually must have some executive capacity." *Id.*

■■■■■■ It is true that a person with executive capacity is generally an agent for the entity he or she serves and has broad authority to bind the principal by his or her statements. It does not follow, however, as *Schultz* seems to say, that persons who do not possess executive capacity can never be agents of the principal for purposes of statements that bind the principal as admissions. The better rule is

> that an admission of an agent or employee . . . "may be received in evidence against his principal, if relevant to the issues involved, where the agent, in making the admission, was acting within the scope of his authority, . . . ."

*Roush v. Alkire Truck Lines,* 299 S.W.2d 518, 521 (Mo.1957) (*quoting* 31 C.J.S. *Evidence* § 343). To the extent that *Schultz* requires executive capacity as the *sine qua non* of the admission by a party-opponent exception to the hearsay rule, it is incorrect and is overruled.

■■■ In the instant case, Bynote testified that the bagger had a National uniform on and that she recognized him from prior visits. Additionally, she later returned to the store and learned his name. The manager testified that the bagger in question was employed by National at the time of the incident and that his duties extended to mopping up spills. The manager also testified

that store policy permitted any employee finding a spill to contact the appropriate employee—a bagger—to clean it up. Bynote testified that the checker who made the first statement took her money when she paid for her groceries. This evidence is sufficient to show that the bagger and checker were employees of National at the time of the statements and that the scope of their duties at that time included the making of those statements: the checker's duty to tell a bagger to clean up a spill if she saw one, and the bagger's duty to respond to the checker's inquiry of whether or not he had cleaned up a spill.

We conclude, therefore, that the statements of the bagger and checker were admissible as vicarious admissions of National. The trial court's error in admitting the testimony as excited utterances was, therefore, an error founded in nomenclature, not substance. It was harmless. Moreover, the statements provided the substantial evidence necessary to show National's knowledge of the dangerous condition prior to Bynote's fall. Bynote made a submissible case and the trial court did not err in overruling National's motion for a directed verdict.

### III.

National's final point assigns error to the trial court in allowing "evidence and argument of Respondent's future medical treatment and damages because said testimony was based on speculation and conjecture and lacked foundation."

Additional facts are necessary to understand National's point.

At trial, Bynote testified that Dr. Lipede, her physician, recommended surgery. Bynote said that she feared the surgery and was concerned that the surgery might worsen her condition. She said that she would forego the surgery "unless it gets to where I can't walk or anything, then I guess I'll have to."

Dr. Lipede testified that two different surgical options existed. The first, fusion, had a one-in-four likelihood of success. Dr. Lipede testified that the fusion surgery might not provide any pain relief and could possibly

worsen Bynote's condition. Bynote asked Dr. Lipede if he would recommend the surgery to her if she were his wife; he stated that he would not. He stated, "For completeness we mention surgery, but we have to review the result as not being very good." Dr. Lipede did not recommend the second option, microsurgery, either. Dr. Lipede summarized Bynote's prognosis as poor and believed that surgery would be necessary if she suffered a locked back. Until then he recommended a more conservative, nonsurgical treatment regimen.

When Bynote's attorney asked about the cost of the surgery, assuming it would later be required, National's counsel objected on the grounds that Dr. Lipede was not qualified to answer the question because he was not an orthopaedic surgeon. The trial court overruled the objection. Dr. Lipede estimated that surgery would cost between eighteen and twenty thousand dollars.

Dr. Forbes, Bynote's chiropractor, also testified concerning surgical treatment of Bynote's injuries. When Bynote's attorney asked Dr. Forbes whether Bynote should undergo the surgery, National's attorney objected, stating that Dr. Forbes was not qualified to testify on that matter. The judge overruled the objection. Dr. Forbes discussed microsurgery and a papaya enzyme injection treatment. He stated that Bynote should just tolerate the pain as long as she could "because eventually she's looking at [surgery], in my estimation, I think she's going to eventually have to have it."

■■■■■■ National urges that Bynote failed to show that she would require future surgery because neither of her health care provider witnesses testified that they founded their opinion on the assertedly talismanic "reasonable degree of medical certainty." Unfortunately, National did not offer a specific objection at trial that the phrase had not been used. The objections offered—that Dr. Lipede lacked the qualifications to discuss the costs of surgery and that Dr. Forbes lacked the qualifications necessary to discuss surgery at all—were not sufficient to challenge the degree of certainty of either of the witnesses' opinions about the need for surgery. By failing to offer a specific objection

at trial, National deprived Bynote of the opportunity to ask the question in the form that National now demands on appeal. *See Seabaugh v. Milde Farms, Inc.*, 816 S.W.2d 202, 210 (Mo. banc 1991). Moreover, National failed to question the providers' degree of certainty on cross-examination, the proper forum for raising the doubts it now brings up on appeal. *See Miller v. Weber*, 688 S.W.2d 389, 391–92 (Mo.App.1985). Because the precise words used by an expert witness do not necessarily "render his testimony inadmissible if he intended to express his opinion or judgment," *Lineberry v. Shull*, 695 S.W.2d 132, 136 (Mo.App.1985), we find no merit in this portion of National's argument.

■■■■■ Additionally, National asserts that the testimony of the witnesses themselves shows that the testimony relating to the likelihood of future surgery failed to meet the "reasonably certain" standard. But as this Court has stated, "The mere fact that the course of treatment ... recommended depended upon the results of more conservative treatment prior to surgery does not render the evidence of future surgery inadmissible speculation and conjecture, or deprive such evidence of its probative value." *Seabaugh*, 816 S.W.2d at 210.

Finally, National claims that the trial court erred in permitting testimony and argument as to the cost of the future surgery over National's timely objection at trial. National founded its objection on the fact that Dr. Lipede was not an orthopaedic surgeon.

■■■■ "The trial court has discretion to determine an expert's qualifications to testify on specific matters." *Wingate v. Lester E. Cox Medical Center*, 853 S.W.2d 912, 918 (Mo. banc 1993). This Court reviews such determinations for abuse of discretion. *Inman v. Bi–State Development Agency*, 849 S.W.2d 681, 683 (Mo.App.1993); *Hord v. Morgan*, 769 S.W.2d 443, 448 (Mo.App.1989).

■■■■ In determining expertise, the relevant question is "whether the witness possesses peculiar knowledge, wisdom or skill regarding the subject of inquiry, acquired by study, investigation, observation, practice or experience." *Seabaugh*, 816 S.W.2d at 208.

"The extent to which the expert's qualifications give authority to the expert's opinions is a question of the appropriate weight given to the evidence, which is a jury question." *Vincent By Vincent v. Johnson,* 833 S.W.2d 859, 866 (Mo. banc 1992). *See also Griffin v. Evans Electrical Construction Co.,* 529 S.W.2d 172, 178 (Mo.App.1975) (A doctor who specializes in internal medicine and cardiology may testify on matters upon which a neurologist would have more specialized knowledge.)

■ Dr. Lipede testified that he is a thoracic surgeon whose specialty is cardiovascular surgery and trauma. He treated Bynote for the injuries resulting from her slip and fall. On cross-examination, Lipede admitted he was neither an orthopaedic specialist nor a neurologist. National made no further attacks upon Dr. Lipede's qualifications to testify on the cost of surgery.

While it is true that an orthopaedic surgeon may have been the best qualified witness to testify as to the costs of the future surgery, it does not follow that *only* an orthopaedic surgeon can offer that testimony. *See Seabaugh,* 816 S.W.2d at 208. On this record, Dr. Lipede's qualifications as a surgeon were sufficient to permit him to render an opinion as to the cost of surgery. We, therefore, hold that the trial court did not abuse its discretion in permitting Dr. Lipede's testimony as to the cost of surgery. It follows that it was not error for Bynote's counsel to refer to Dr. Lipede's testimony in closing argument.

## IV.

The judgment of the trial court is affirmed.

All concur.