

# Missouri Court of Appeals

## Southern District

In Division

STATE OF MISSOURI, )
      )
    Respondent, )   No. SD37572
      )
v. )   **Filed: June 29, 2023**
      )
STEVEN RAY ENDSLEY, )
      )
    Appellant. )

APPEAL FROM THE CIRCUIT COURT OF LACLEDE COUNTY

Honorable Kenneth M. Hayden, Judge

**<u>AFFIRMED</u>**

Steven Ray Endsley ("Endsley") appeals the trial court's judgment convicting him of two counts of first-degree murder, two counts of armed criminal action, and one count of second-degree arson, following a bench trial.[1] Endsley raises three points on appeal. In point 1, Endsley argues the trial court abused its discretion in overruling his hearsay objection to an out-of-court statement made by Endsley's son, Matthew Endsley ("Matthew"), because the statement did not qualify as an excited utterance.[2] In points 2 and 3, Endsley argues there was insufficient evidence to support his convictions of murder in the first degree for the deaths of Teresa

---

[1] *See* §§ 565.020, 571.015, and 569.050. All statutory citations are to RSMo (2016).
[2] We refer to members of Endsley's family by their first name to avoid confusion. No disrespect or familiarity is intended.

Jackson ("Jackson") and her daughter, Danielle Smith ("Smith") (collectively, "Victims"). Finding no merit in Endsley's points, we affirm.

## Facts and Procedural Background[3]

During the early morning hours of August 29, 2016, the remains of Victims were discovered in their burnt trailer home on Floyd's Road. Prior to the fire, Victims were stabbed multiple times.[4] The medical examiner determined both Victims died from stab wounds rather than from the fire.

Victims' trailer home was less than 40 feet from Endsley's trailer home at the end of Floyd's Road, a dead-end street.[5] Endsley and Victims had a history of conflict, beginning in November 2015.[6] On August 28, 2016, the day before Victims were murdered, the conflict between Endsley and Victims had escalated. That afternoon, Smith sent a text message to a friend describing the conflict between Endsley and Jackson saying "I'm sitting on porch waiting because [Jackson's] being a bitch and dude in his garage talking crap, staring and shit. LOL. WTF. Over." Smith later sent another text stating Jackson was screaming out the door at Endsley. That same afternoon, Endsley told the trailer park manager that he would burn down Victims' trailer home, if he thought he could get away with it.

That evening, Jackson called Smith and told her to come home because Endsley was harassing her, shining a green laser light into her home, and screaming that his wife wants to "beat [her] fucking ass." Smith arrived home around 11:30 p.m. At about 11:35 p.m., Smith texted a friend, "And she's making this neighbor situation worse by screaming out the door."

---

[3] The evidence is summarized in the light most favorable to the verdict. ***State v. Stewart***, 560 S.W.3d 531, 533 (Mo. banc 2018).

[4] Smith had five stab wounds to her chest, in the area of her ribs. Jackson had two stab wounds to her back.

[5] Endsley's wife, ("Michelle"), and Matthew, lived in the trailer home with Endsley. Endsley's other son, ("Michael"), also lived in a mobile home in the same trailer park.

[6] Beginning in November 2015, the Endsleys began having "issues" with Victims. The police were called to the trailer park on several occasions regarding altercations between the Endsleys and Victims. In July 2016, Smith posted a video to Facebook, which showed Endsley arguing with Smith, and Endsley saying, "she's a faggot and she's an abomination."

2

Soon after that, Smith began posting on Facebook requesting "major lawyer advice" to assist her with the "neighbor situation," which was escalating.

Smith then posted comments to Facebook describing the conflict with Endsley, mentioning "he threatens and everything else, too." At 12:10 a.m., Endsley left a voicemail for Smith which said he was "glad [Smith was] recording everything." He didn't think the recordings would "get [her] anywhere now." "We've got a new sheriff in town, and guess what? I coached his son for three years in football[,]" and Smith should "just move." At 12:23 a.m., Endsley texted Smith, "No dikes or faggots." One minute later, Endsley texted "Move" and "Bipolar lesbos" to Smith. At 12:34 a.m., Smith posted to Facebook "Now he prank calling, texting, FML. More evidence, though. Calling me a faggot." Two minutes later, Smith posted her last comment on Facebook, and then all messaging and posting activity stopped. Around that same time, Endsley's messages and voicemails to Smith also stopped.[7]

At 2:19 a.m., surveillance footage from local businesses showed Endsley's van and Smith's car leaving Floyd's Road together. Endsley's van returned around 3:30 a.m., but Smith's car never returned and was later discovered abandoned along a secluded road in a different county.

At about 4:30 a.m., Endsley called his sister to tell her that he was coming to visit her, even though she lived four hours away and he had not seen her in several years. Endsley left Floyd's Road again just before 5:00 a.m.

At approximately 5:00 a.m., Endsley's wife, Michelle, woke up the trailer park manager to tell her Victims' trailer was on fire. The trailer park manager saw the fire and told Michelle, "Your fucking husband did this. Your fucking husband did this. I know he did it. Where is the van? Where is [Endsley]? Where is [Endsley]? Where's [Endsley]?" Endsley was the only

---

[7] Endsley's next text was sent to Matthew around 1:30 a.m. and said, "Bring shine." Endsley made his own "moonshine" on his property.

family member missing from the scene while the trailer was burning.[8]  At 5:02 a.m., a 911 call was made to report the fire.

Within ten minutes of the 911 call, the fire department arrived.  The intensity of the fire made it difficult to extinguish.  The trailer park owner, Timothy Davis ("Davis"), arrived at the scene at approximately 5:30 a.m.  Davis could see inside the trailer and saw "the top of somebody's head[,]" including the "skull with the hair burned up."  Matthew left his trailer and stood about an arm's length away from Davis.  With tears in his eyes, Matthew turned to his brother, Michael, who was also standing there, and said, "This didn't have to happen.  He didn't have to do this."  Michael grabbed Matthew by the arm, and told him to "shut up and get in the truck[.]"  Matthew started crying, and Michael then "pulled [Matthew] over and pushed him in the – into the truck and slammed the door and said, 'We're going to work.'"

Investigators determined the fire was intentionally set, and had been started from inside the trailer, close to the center of the house where Victims' bodies were located.  Liquid pour patterns at the scene indicated two chemical accelerants were used to set the fire:  gasoline and one other accelerant which was unidentifiable due to how long and hot the fire burned.  Inside the trailer, detectives found remnants of two knives located "in a place that you wouldn't normally have knives[.]"  The fire destroyed any trace evidence that might have been on the knives.

Meanwhile, Endsley traveled to his sister's house, and arrived around 10 a.m.  Endsley had moonshine in the van and was drunk.  After arriving at his sister's home, Endsley called Michelle using his brother-in-law's cell phone.

Detectives decided to contact Endsley at his sister's house.  While en route to the house, detectives came up behind a Mustang owned by the Endsleys; Michelle was driving and

---

[8] Later that morning, Endsley texted Michelle, "All good?" to which Michelle responded, "Yeah, just sick to my stomach."  Endsley then replied, "Hang tough."

Matthew was in the passenger seat. The two were on their way to meet Endsley with clothes for him.

Detectives arrived at Endsley's sister's residence and spoke with Endsley. Endsley told officers he knew they were there to discuss the trailer fire and that he had already contacted his attorney. Endsley told detectives he did not have a cell phone. Officers searched Endsley's van and found several mason jars of moonshine and several knives. Multiple knives were also recovered from Endsley's garage.

Endsley was arrested for Victims' murders. While in jail, Endsley made phone calls to Michelle, which were recorded. In one call, Endsley told Michelle he should have gotten more help for his head. Michelle agreed, saying "Something's not right." Endsley then said it was too bad he would not know his grandson. In another call, Endsley said if the police had taken Smith and Jackson to jail earlier, they would have gotten the hint to "stop fucking around."

Endsley was found guilty by the trial court of the charged offenses and was sentenced to life without parole for each count of first-degree murder, 20 years' imprisonment for each count of armed criminal action, and seven years' imprisonment for the arson charge, with each sentence to run consecutively to each other. Endsley appeals from that judgment in three points. For ease of analysis, we address Endsley's points out of order.

### Points 2 and 3—Sufficiency of the Evidence

Endsley argues there was insufficient evidence to prove he committed the murders of Jackson (point 2) and Smith (point 3).[9] We disagree.

Our review of the sufficiency of the evidence is "limited to whether the State has introduced adequate evidence from which a reasonable finder of fact could have found each

---

[9] A person commits the crime of first-degree murder if "he or she knowingly causes the death of another person after deliberation upon the matter." § 565.020.1. Endsley does not dispute the State's evidence was sufficient to show Victims were murdered. Rather, his argument challenges the sufficiency of the evidence to show he was the person who committed the murders.

5

element of the crime beyond a reasonable doubt." ***State v. Lammers***, 479 S.W.3d 624, 632 (Mo. banc 2016). "All evidence and inferences favorable to the State are accepted as true, and all evidence and inference[s] to the contrary are rejected." ***State v. Porter***, 439 S.W.3d 208, 211 (Mo. banc 2014). "Evidence is sufficient to support a conviction when there is sufficient evidence from which a reasonable [fact-finder] might have found the defendant guilty beyond a reasonable doubt." ***State v. Shaw***, 592 S.W.3d 354, 357 (Mo. banc 2019) (quoting ***State v. Clark***, 490 S.W.3d 704, 707 (Mo. banc 2016)). We defer to the fact-finder's superior position to weigh and value the evidence, determine the witnesses' credibility and resolve any inconsistencies in their testimony. ***State v. Soliben***, 621 S.W.3d 585, 590 (Mo. App. S.D. 2021).

Endsley argues the State failed to prove he committed the murders because there was only circumstantial evidence which established no more than a motive, an intent, and an opportunity to commit the crimes. This argument fails because: (1) the evidence, and the reasonable inferences therefrom, established *more* than just an intent and an opportunity to commit the crimes and (2) the State may satisfy its burden of proof by presenting circumstantial evidence connecting the defendant to each element of the crime.[10] ***State v. Mills***, 623 S.W.3d 717, 724 (Mo. App. E.D. 2021).

Here, the evidence was sufficient for a rational fact-finder to conclude, beyond a reasonable doubt, that Endsley committed the murders. Endsley and Victims had an extensive history of conflict. On the evening before and morning of the homicides, Smith texted her friend about the tension between Jackson and Endsley, and Endsley told the trailer park manager he

---

[10] "Circumstantial evidence is evidence which does not directly prove a fact in issue, but gives rise to a logical inference that the fact exists." ***State v. Howery***, 427 S.W.3d 236, 245 (Mo. App. E.D. 2014) (quoting ***State v. Fitzgerald***, 778 S.W.2d 689, 691 (Mo. App. E.D. 1989)). As long as the evidence meets the minimal appellate standard required by due process, an appellate court need not disturb the result simply because the case depended on circumstantial evidence. ***State v. Grim***, 854 S.W.2d 403, 406 (Mo. banc 1993).

would burn down Victims' trailer if he thought he could get away with it. While Smith was out, Jackson texted Smith to return home because Endsley was harassing her and screaming at her. Around midnight, Smith made several posts about the issues she was having with Endsley. Endsley then sent Smith texts calling her derogatory names and telling her to move. Around 12:30 a.m., Smith made her last post and quit sending messages. Around that same time, Endsley stopped calling and texting Smith. Later that morning, Endsley's van was caught on surveillance leaving Floyd's Road, followed by Smith's car. Endsley's van returned, but Smith's car was later found abandoned in a neighboring county. At 4:30 a.m., Endsley called his sister, who lived almost four hours away, and told her he was coming to visit, even though he had not seen her in years. Endsley left for his sister's house around 4:50 a.m., and by 5:00 a.m., Victims' trailer was engulfed in flames. When officers contacted Endsley at his sister's house, Endsley said he knew the officers were there to speak to him about the trailer fire and told the officers he did not have a phone. While in jail, Endsley made incriminating statements in recorded phone calls to Michelle, including that he should have gotten help for his head and that if the police had arrested Victims during previous altercations, maybe Victims would have gotten the hint to "stop fucking around." While no piece of this evidence in isolation may have been sufficient, the totality of this evidence was sufficient for the trial court to find Endsley guilty of both counts of first-degree murder. Points 2 and 3 are denied.

### Point 1—Overruling the Hearsay Objection

Endsley argues the trial court abused its discretion in overruling his hearsay objection to the admission of Matthew's statement, "This didn't have to happen. He didn't have to do this."[11] The State argues Matthew's statement fell under the excited-utterance exception to the hearsay rule. We agree with the State.

---

[11] This statement was admitted as evidence through the deposition transcript of the trailer park owner, Davis. In his deposition, Davis described the scene and testified he heard Matthew make the statement. Davis died prior to trial.

We review a claim that hearsay was improperly admitted for an abuse of discretion. *State v. Perkins*, 656 S.W.3d 285, 302 (Mo. App. E.D. 2022). The trial court has broad discretion to admit or exclude evidence during a criminal trial, and error occurs only when the trial court clearly abuses that discretion. *State v. Wood*, 580 S.W.3d 566, 574 (Mo. banc 2019). A trial court abuses that discretion when a ruling is clearly against the logic of the circumstances and is so unreasonable as to indicate a lack of careful consideration. *State v. Forrest*, 183 S.W.3d 218, 223 (Mo. banc 2006). "An abuse of discretion occurs when a defendant is prejudiced such that 'there is a reasonable probability that the outcome at trial would have been different if the error had not been committed.'" *State v. Minor*, 648 S.W.3d 721, 732 (Mo. banc 2022) (quoting *State v. Holmsley*, 554 S.W.3d 406, 410 (Mo. banc 2018)).

Generally, hearsay evidence is both undesirable and inadmissible because the maker of the offered statement is neither under oath, nor subject to cross-examination, nor subject to the fact-finder's ability to judge the demeanor at the time the statement is made. *State v. Link*, 25 S.W.3d 136, 145 (Mo. banc 2000). However, such statements may be admissible if they fall within a recognized exception to the rule. *State v. Kemp*, 212 S.W.3d 135, 146 (Mo. banc 2007). The excited-utterance exception is one such exception. *State v. Gott*, 523 S.W.3d 572, 577 (Mo. App. S.D. 2017).

"The excited-utterance exception applies to statements made following a startling or unusual occurrence sufficient to overcome normal reflection, such that the ensuing declaration is a spontaneous reaction to the startling event." *State v. Robinson*, 535 S.W.3d 761, 766 (Mo. App. E.D. 2017). "The essential test for admissibility of a spontaneous statement or excited utterance is neither the time nor place of its utterance but whether it was made under such circumstances as to indicate it is trustworthy." *Gott*, 523 S.W.3d at 577 (quoting *State v. Van Orman*, 642 S.W.2d 636, 639 (Mo. banc 1982)). "Because the statement is spontaneous and made under the influence of events, the statement is assumed trustworthy because it is

8

unadorned by thoughtful reflection." ***Kemp**,* 212 S.W.3d at 146 (quoting ***Bynote v. Nat'l***

***Super Mkts., Inc.***, 891 S.W.2d 117, 122 (Mo. banc 1995)).  This exception is grounded in:

> the human experience that, under certain external circumstances of physical shock, a stress of nervous excitement may be produced which stills the reflective faculties and removes their control, so that the utterance which then occurs is a spontaneous and sincere response to the actual sensations and perceptions already produced by the external shock.

***State v. Post***, 901 S.W.2d 231, 234 (Mo. App. E.D. 1995) (internal quotations and citation

omitted).  In deciding if the excited-utterance exception applies, courts consider:

> [1] the time between the startling event and the declaration, [2] whether the declaration is in response to a question, [3] whether the declaration is self-serving, and [4] the declarant's physical and mental condition at the time of the declaration.  While no one factor necessarily results in automatic exclusion, all should be considered in determining whether the declaration was the result of reflective thought.

***Gott***, 523 S.W.3d at 577 (quoting ***Bynote***, 891 S.W.2d at 122).

The trial court did not abuse its discretion in admitting the out-of-court statement made

by Matthew that "This didn't have to happen.  He didn't have to do this."  First, the duration

between the startling event (viewing the smoldering remains of the trailer and observing

Victims' burned bodies) and Matthew's statement, was brief.  Matthew made the statement

immediately after walking up to the scene, suggesting the statement was made in reaction to the

emotional stress of seeing his neighbors' destroyed home and burned bodies.  Second,

Matthew's statement was voluntary and not in response to any question.  No one had been

speaking to Matthew when he made the remark.  Third, the statement was not self-serving.  In

the context of a criminal case, whether a statement was self-serving focuses on exculpatory

statements by a defendant that are the result of reflective thought.  ***Id.*** at 578.  While Matthew is

not a defendant, the statement serves no self-interest, and actually cuts against any personal

interest he may have had in protecting his father.  Finally, Matthew was visibly distraught when

he made the statement.  He had tears in his eyes and eventually started crying.  These factors

support the conclusion that Matthew's statement was spontaneous and made under the

9

influence of observing a tragic and unusual event and was not the product of reflective thought. Accordingly, the trial court did not abuse its discretion in admitting Matthew's statement pursuant to the excited-utterance exception.[12]  Point 1 is denied.

## Conclusion

The trial court's judgment is affirmed.

MARY W. SHEFFIELD, J. – OPINION AUTHOR

BECKY J.W. BORTHWICK, J. – CONCURS

GINGER K. GOOCH, J. – CONCURS

---

[12] Furthermore, given the ample (albeit circumstantial) evidence of Endsley's guilt, there is no reasonable probability that the admission of the statement was outcome determinative.