Janet Winslow PETERSON and Linda Winslow Lambright, Appellants,

v.

PROGRESSIVE CONTRACTORS, INC., et al., Respondents.

No. WD 74550.

Missouri Court of Appeals, Western District.

May 21, 2013.

Edwin H. Smith, St. Joseph, MO, for appellants.

T. Michael Ward and Teresa M. Young, St. Louis, MO, for respondents.

Before Division Three: JOSEPH M. ELLIS, Presiding Judge, LISA WHITE HARDWICK, Judge and CYNTHIA L. MARTIN, Judge.

CYNTHIA L. MARTIN, Judge.

Janet Winslow Peterson ("Janet")[1] and Linda Winslow Lambright ("Linda") (collectively "Appellants") appeal from the entry of judgment following a jury trial in favor of Progressive Contractors, Inc. ("PCI") and Highway Technologies, Inc. ("HTI") (collectively "Respondents") on their claims for personal injuries and for wrongful death. Appellants claim the trial court erroneously overruled an objection to closing arguments made by PCI and HTI that each implemented traffic control and safety measures in a highway construction work zone in the manner directed by the Missouri Highways and Transportation Commission ("MHTC"). Appellants claim the closing arguments misled the jury by suggesting the Respondents owed no duty to Appellants beyond the duty to perform their contracts. Appellants also claim the trial court erroneously excluded hearsay testimony about a statement made by PCI's job foreman because the statement was an admission against PCI's interest.

Finding no error, we affirm.

**Factual and Procedural History**

On September 23, 2007, Tiffany Peterson ("Tiffany") was driving a car that was involved in a one-car accident. The accident occurred at approximately 9:00 p.m. on eastbound U.S. Highway 36 on a bridge over the Missouri River in between Elwood, Kansas and St. Joseph, Missouri. The expansion joints on the bridge were in the process of being replaced. No one was working on the bridge at the time of the accident. Various traffic control devices were in place to warn drivers about the construction zone and to divert traffic from the right lane of travel.

Notwithstanding the traffic control devices, Tiffany believed she could permissibly access an exit from U.S. Highway 36 to I-229 Highway. Tiffany drove between traffic channelizers into the right lane of travel toward the exit ramp. Before reaching the ramp, Tiffany's car dropped into a large uncovered hole on the bridge where an expansion joint had been removed.

There were two passengers in the car at the time of the accident. Tiffany's mother, Janet, was seated in the back seat behind Tiffany. Janet's mother (Tiffany's grandmother), Virginia Winslow ("Virginia"), was seated in the front passenger seat. All three women sustained injuries. Virginia is alleged to have suffered from her injuries for several months, resulting in her death on February 24, 2008.

Janet and her sister, Linda, filed suit for Janet's personal injuries and for the wrongful death of their mother, Virginia. They sued MHTC, PCI, and HTI. MHTC owned the highway were the accident occurred. PCI was the general contractor under contract with MHTC to replace the expansion joints on the bridge. HTI was a subcontractor under contract with PCI to provide traffic control services. The petition asserted that the defendants failed to exercise ordinary care to ensure that the work zone through which Tiffany traveled was in a reasonably safe condition for motorized traffic.

Prior to trial, Janet and Linda settled with MHTC pursuant to a section 537.065 agreement.[2] Janet's claims for her per-

---

1. Because several persons with the name of Peterson, Winslow, or Lambright are involved in this case, we refer to these individuals by their first names. No undue familiarity or disrespect is intended.

2. All statutory references are to RSMo 2000 as supplemented except where otherwise noted. "Section 537.065 allows a claimant and a tort-feasor to contract to limit recovery to specified assets or insurance coverage."

sonal injuries, and Janet and Linda's claims for the wrongful death of their mother, proceeded to trial against PCI and HTI.

Appellants' evidence emphasized that MHTC's original traffic control plan was "safe" and "reasonable," and that neither PCI nor HTI performed their work in accordance with this plan. Instead, PCI secured MHTC's approval to modify the traffic pattern. Instead of traffic moving back and forth from the left and right lanes as each expansion joint on the bridge was separately replaced, the modified pattern required traffic to stay in the left lane across the bridge while all four expansion joints were replaced. This approved modification required MHTC to generate a modified traffic control plan. Appellants argued that Respondents should not have sought permission to modify the traffic control plan, and that in any event, they failed to perform their work in accordance with the modified traffic control plan.[3]

Respondents' evidence emphasized that it played no role in designing either the original or modified traffic control plan and that MHTC's design engineers were responsible for that work. Respondents' experts opined that the modification of the traffic pattern on the bridge to require traffic to stay in the left lane while all expansion joints were replaced, instead of moving back and forth between lanes as each expansion joint was replaced, resulted in a safer work zone. Respondents' evidence also indicated that Respondents' work was performed in accordance with the modified traffic control plan.

Appellants sought to introduce the testimony of Roger Lambright ("Roger"), Janet's brother-in law, about a conversation he had with an individual at the accident scene the day after the accident. The individual purportedly told Roger that he wanted to talk to police because he was tired of people driving through "his concrete." The trial court sustained PCI's hearsay objection to the testimony.

At the close of the evidence, four verdict directors were submitted to the jury addressing Janet's claims for personal injuries against PCI and HTI, and addressing Janet and Linda's claims for wrongful death against PCI and HTI. The verdict directors each required the jury to find:

[E]ither:

defendant [PCI or HTI] failed to barricade or cover the hole it cut in the highway to prevent motorists exiting onto I–229 from driving into it,

or

defendant [PCI or HTI] failed to provide signs, signals, lights, pavement markings, channelizers, and/or other traffic control devices sufficient to direct motorists exiting onto I–229 around the hole it cut in the highway

Each verdict director then instructed the jury that it must determine:

[Whether] defendant [PCI or HTI], in any one or more of the respects submitted . . . was thereby negligent, and

[Whether] such negligence directly caused or directly contributed to cause [damage to Janet or the death of Virginia][4]

---

*Houston General Ins. Co. v. Lackey,* 907 S.W.2d 177, 180 (Mo.App. W.D.1995).

**3.** Appellants' evidence and argument on this point was inconsistent. Appellants' expert testified that the modified traffic control plan was "safe," but simply had not been followed by the Respondents. Other evidence hinted

that Appellants challenged the safety of the modified traffic control plan itself, whether or not it was followed by the Respondents.

**4.** The bracketed phrases reflect that the four verdict directors varied depending on which

Negligence was defined in the jury instructions as the failure to use the degree of care that an ordinarily careful person would use under the same or similar circumstances.

During PCI's closing, PCI made several arguments suggesting that MHTC's engineers designed and approved both the original and the modified traffic control plan, that PCI had no authority but to follow MHTC's traffic control plan, that PCI performed its work in accordance with the modified traffic control plan, and that in doing so it acted as an ordinary, reasonable, and prudent person. During a break in the argument, Appellants generally objected that PCI was misstating the law by arguing that its only duty was to perform its contract. The trial court overruled the objection and found that PCI was permitted to argue that it acted as an ordinary, reasonable, prudent man by choosing to follow the modified traffic control plan. Appellants did not object during HTI's closing argument.

The case was submitted to the jury. Approximately one hour later, the jury returned its verdict in favor of the Respondents. The trial court entered judgment accordingly. Appellant's post trial motions were denied.

Appellants filed this timely appeal.

## Analysis

Appellants raise two points on appeal. First, they claim that the trial court erred in overruling their objection and permitting Respondents to argue during closing "that the only duty of care they owed [Appellants] in ensuring the reasonable safety of the [construction work zone] was to follow the directives of MHTC in implementing traffic control and safety measures." [Appellants' Brief, p. 16]. Second,

claim and which defendant was being submit-

Appellants claim that the trial court erred in sustaining Respondents' hearsay objection which excluded Roger's testimony about a PCI foreman's statement that "he was tired of people driving through his concrete" because the statement was an admission against a party opponent.

## Point One

Appellants complain that the trial court erroneously overruled their objection to Respondents' closing arguments relating to Respondents' performance of their work in accordance with MHTC's modified traffic control plan. Appellants contend that the arguments misstated the duty owed by the Respondents as instructed in the verdict directors because a road contractor owes third persons the non-delegable duty to exercise reasonable care for their safety, a duty whose origin is in the common law and not limited or defined by contract.

### *Standard of Review*

■ A trial court's rulings on objections made to remarks by counsel during closing arguments are reviewed for abuse of discretion. *Peters v. ContiGroup*, 292 S.W.3d 380, 390 (Mo.App. W.D.2009). The trial court is afforded wide latitude in closing argument regarding the arguing of facts and inferences drawn from the evidence. *Warren Davis Props. v. United Fire & Casualty Co.*, 111 S.W.3d 515, 527 (Mo.App. S.D.2003). "[T]he permissible field of argument is broad, and so long as counsel does not go beyond the evidence and the issues drawn by the instructions, or urge prejudicial matters or a claim or defense which the evidence and issues drawn by the instructions do not justify, he is permitted wide latitude in his comments." *Heshion Motors, Inc. v. W. Int'l Hotels*, 600 S.W.2d 526, 534 (Mo.App. W.D. 1980). However, "[m]isstatements of law

ted.

are impermissible during closing argument and a trial court has the duty, not discretion, to restrain and purge such arguments." *Bradley v. Waste Mgmt. of Mo., Inc.,* 810 S.W.2d 525, 528 (Mo.App. E.D. 1991). If a complained of argument during closing is within the purview of a matter to be determined by the jury as it has been instructed, the argument is not a misstatement of the law. *Heshion Motors,* 600 S.W.2d at 534.

■■ Reversal of a trial court's ruling during closing argument "is only warranted *on properly preserved claims of error* if such an abuse of … discretion occurred that a defendant was definitively prejudiced by the decision, i.e., the statement of which a defendant complains must have had a 'decisive effect on the jury's determination.'" *State v. Talley,* 258 S.W.3d 899, 913 (Mo.App. S.D.2008) (quoting *State v. Storey,* 40 S.W.3d 898, 910 (Mo. banc 2001)) (emphasis added). "[E]ven if an argument is deemed improper, such an argument only constitutes reversible error if there is a reasonable probability that the verdict would have been different without it." *Id.* (citing *State v. Martin,* 103 S.W.3d 255, 264 (Mo.App. W.D.2003)); *see also State ex rel. State Highway Comm'n v. Thurman,* 428 S.W.2d 955 (Mo.App.1968) ("[T]o be reversible error improper argument by counsel and assent to such remarks by the court must have been of such importance as to render it probable that prejudice to the opposing party resulted therefrom and the jury was influenced thereby in the rendition of its verdict.").

### Preservation of Claim of Error

Before reaching the merits of Appellants' claim of error, we must first address whether Appellants' objection, made well *after* the relevant portions of PCI's closing had been delivered and never made during HTI's closing, properly preserved the claim for appellate review.

■■ Generally, "when a party fails to object to an allegedly erroneous argument *at the time it is made,* his claim of error is foreclosed from consideration." *Peters v. Henshaw,* 640 S.W.2d 197, 201 (Mo.App. W.D.1982) (citing *Mueller v. Storbakken,* 583 S.W.2d 179, 186 (Mo. banc 1979)) (emphasis added). The rule requiring timely objections during opening statement or closing argument recognizes the principle that "[a] party who seeks to correct the misconduct of counsel during trial … owes the court the opportunity to give relief by a request for instant action and ruling." *State ex rel. State Highway Comm'n v. Drisko,* 537 S.W.2d 645, 648 (Mo.App.1976) (citing *Minor v. Lillard,* 306 S.W.2d 541, 548 (Mo.1957)).

In *State v. Robb,* 439 S.W.2d 510, 514 (Mo.1969), our Supreme Court found that an objection to the State's opening statement, made after the opening statement was complete, and six pages later in the transcript from the point of the offending statement, "came too late to preserve the point." In *Drisko,* the court held that "[a]n objection which is deferred until the end of the opening statement comes too late and waives the prejudicial effect of the misconduct." 537 S.W.2d at 648.

Here, PCI's closing argument began on page 2385 of the transcript. PCI's argument focused on a discussion of its negligence through page 2405 of the transcript. PCI made the following arguments at various points over those twenty pages of transcript:

> And what are the issues? Well, it's real simple. All right [sic]? … First of all, was my client guilty of negligence? All right [sic]. That's No. 1. If so, did that negligence cause plaintiffs' damages?
>
> . . . .

So what are the facts on the negligence issue? Well, I don't think all the credible, believable witnesses say—and I don't think there's any—even [Appellants' expert witness] said, "Well, [MHTC] had the responsibility. It was their highway. They had the ultimate responsibility for the design and construction and operation of the highway because they're the owner," which makes perfect sense.

And additionally, too, there was no dispute that [MHTC] had design engineers, five of them, three in St. Joe and two in Jeff City, who designed the plans and specs and approved the temporary traffic control plans that was [sic] implemented on this project, who are licensed professional engineers. All right [sic]. Now, we are a contractor. We are a— our expertise is pouring concrete and fixing expansion joints. That [sic] what we do. All right [sic]? And part of what we do is when we bid on a job, we have to follow what [MHTC] tells us to do. And we can say whatever we want to [MHTC], but ultimately they're the ones who's [sic] paying the bill.

. . . .

And the fact is we agreed to follow their plans and specs. They told us what to do and we did it. And there's no dispute.

. . . .

I mean, there's no evidence of any kind that we didn't—of any kind that we didn't follow what [MHTC] wanted us to do.

. . . .

I mean, we did what we were told to do and we followed the plans and specs. And the experts in designing traffic control plans, the ones who have construction going all over the entire state of Missouri, who set up temporary traffic control plans throughout the state of Missouri. . . . [T]he fact of the matter is a lot of construction going on and has for many years in the state of Missouri on these highways. All right [sic]? They, [MHTC], is responsible for designing them and they do it. And they are the experts on doing that. And that's why they have engineers and staff to do that.

They don't pay us to do that. They do it. They have their own employees to do it. All they ask us to do is to implement it and they pay their people to make sure we do implement it and that we've done it according to how they asked. And we did and there has been no evidence in this case that we didn't.

. . . .

You've heard from [PCI's expert witness]. You've heard from [MHTC's resident engineer] who said, "hey, this is a reasonable plan. This work was reasonable, the way this was done."

. . . .

Is it reasonable to expect when you have a closed traffic lane and you have this narrow space to get through that some car's going to go driving right through there? I don't think it is.

And is somebody exercising ordinary care in the way this was set up? It was entirely proper. *And that's what an ordinary careful and prudent person would do. They would follow the direction of a licensed professional engineer. They would follow the directions of the expert, [MHTC], and about how to set these things up. That's what an ordinary careful and prudent person does under a similar situation.*

(Emphasis added.) Appellants did not object at the time any of the aforesaid arguments were made on the basis that the arguments were misstatements of the law.

After completing the discussion of liability, PCI's counsel turned to a discussion of medical causation and damages. A few minutes into this discussion, the trial court initiated a break in the proceedings at page 2408 of the transcript. It was during this fortuitous break that Appellants first registered an objection that PCI's closing argument misstated the law:

> [T]his whole "We were just doing what [MHTC] told us" is a misstatement of the law. That has not been submitted to the jury. And if the Court doesn't correct misstatements of the law during closing arguments, that is reversible error. And the law in this case is not— they cannot get up and say, "We were just following [MHTC's] orders." We've been talking about that for weeks and weeks and weeks.... And I don't want to interrupt [PCI's] argument, but that's not the law. That's not what the jury is allowed to consider in their instructions. And, you know, we've briefed it. We've talked about it. The Court has—
>
> The Court: You have.
>
> Appellants' counsel:—told us from day one that that's probably a proper subject for closing argument. That's where we are now.
>
> The Court: Ok.
>
> Appellant's counsel: And that's all we're hearing, is "We just did what [MHTC] told us to."

Appellants' objection did not specify *any* particular statement made by PCI during its closing, leaving this Court to speculate which of PCI's arguments Appellants intended, and that the trial court understood, the objection to attack.

PCI responded to the objection that it was not arguing the law, but that it was arguing that "a reasonable, ordinary careful, prudent person would ... follow the directions of a person who has the licensed professional engineers to do the work."

The trial court overruled Appellants' objection and noted that "[PCI] is arguing that [PCI] was not negligent because the person that hired them had given them directives to do this and this was what an ordinarily careful person would do under these circumstances.... I think they can [argue that they were following MHTC's approved plans] in the context of whether or not they were negligent and they were acting as an ordinarily careful person in this circumstance." In other words, the trial court ruled the arguments related to a matter to be determined by the jury as it has been instructed. Appellants did not request a limiting instruction directing the jury to consider PCI's "doing what it was told" arguments only on the issue of its negligence as defined.

After the trial court overruled its objection, Appellants' counsel noted:

> That [the objection] would obviously apply to [HTI], too, because I assume they're going to argue the same thing.

In response, one of the attorneys for HTI noted that lead counsel for HTI, who would be handling the closing argument, was not in the courtroom, and that Appellants' counsel had been advised of that when he began his objections. The trial court noted "[h]e's not here. All right. [sic]"

When proceedings reconvened, PCI completed its closing. Then, HTI delivered its closing argument. HTI argued that it had a very limited role on the project and did exactly what it was supposed to do. HTI argued that there was no evidence it even knew of the open hole into which Tiffany drove her vehicle or that it "was ever asked to do anything or supply barricades or steel plates" to cover the hole. HTI urged that:

> [HTI] provided exactly everything that it was asked to provide. It placed ev-

erything that it was asked to provide exactly where it was told to place it. . . . But every witness . . . agreed that there's only one party that had any involvement in this project that had the authority to make decisions as far as what could be used when, where, how, and that's [MHTC]. And they're not in this case.

Appellants did not object during HTI's closing argument.

During their rebuttal closing argument, the Appellants told the jury to follow the verdict directors:

Now when you go back in the jury room and you look at your verdict directors, . . . see if you're allowed to return a verdict even if you find [it] true [that PCI and HTI just did what they were told to do] because that's not the law that's going back with you into that room. . . . Rather the law is whether or not these people used ordinary care to do the jobs they were supposed to do.

On this record and in light of the applicable law, discussed *supra*, Appellants' objection, which failed to specify any particular argument by PCI to which it was intended to attach and which was not made until a break taken by the court well after the allegedly offending arguments, violated the rule requiring an objection to be "made at the earliest opportunity after the objectionable character of the [argument] becomes apparent." *Warren Davis Props.*, 111 S.W.3d at 529. In *Warren Davis Properties*, our Southern District held that an objection during closing to an offending argument preserved no claim of error when the same offending argument had been made, without objection, much earlier in the closing. *Id.* Here, not only did Appellants fail to object at *each* of the several points in PCI's closing potentially implicated by Appellants' general objection, Appellants failed to register any ob-

jection until well after PCI had completed its discussion of its negligence and had moved into a discussion of medical causation and damages.

Appellants argue that so long as the "purpose" of Rule 84.13(a) to permit the trial court an opportunity to correct error is satisfied, no delay in objecting should warrant the conclusion that the objection failed to preserve a claim of error. Appellants cite no authority for this proposition. More to the point, we are being asked to survey twenty pages of closing argument transcript and numerous potentially offending comments made by PCI to determine whether Appellants' general and untimely objection was properly asserted and overruled. Even if we accept Appellants' contention that Rule 84.13(a) does not require a timely objection as a condition to preserving a claim of error so long as the purpose of the Rule is served, we cannot conclude on these facts that the purpose of the Rule has been served.

Appellants alternatively argue that even if the timing of their objection was problematic, they should be excused "because an objection at any other time would have been useless . . . [because] it is clear from the record that no matter the timing of Appellants' objection, the court's ruling was going to be the same." [Appellants' Brief, p. 3]. Read literally, Appellants' argument is that if the result of an objection is a foregone conclusion, a party is relieved of the obligation to timely object as a condition of preservation of a claim of error. Appellants cite *Hyde v. Butsch*, 861 S.W.2d 819 (Mo.App. E.D.1993), in support of their position. That case, however, holds only that a failure to make an offer of proof about excluded evidence was excusable when it was clear the offer would have had no impact on the trial court's decision to summarily stop cross-examination at predetermined time. *Id.* at 820–21.

Appellants also cite *State v. Bowlin,* 850 S.W.2d 116 (Mo.App. S.D.1993). That case holds only that an offer of proof is not essential to preserve a claim of error regarding excluded testimony when "the basis for exclusion dealt solely with the matter of the oath to be administered and had nothing to do with the content of the witnesses' testimony." *Id.* at 118. Neither case supports the broad, general principle that untimely objections should be excused if it is apparent the objection would have been overruled.

In light of the foregoing, we conclude that Appellants' delinquent, general objection did not properly preserve their claim of error with respect to arguments made during PCI's closing. Further, Appellants raised no objection during HTI's closing argument. Though at the conclusion of the bench discussion about the objection to PCI's closing argument, Appellants noted the same objection would apply equally to HTI's closing, Appellants' counsel was notified that necessary trial counsel was not present. The trial court observed the same and gave no indication that Appellants' objection would be deemed a continuing one. Appellants have not properly preserved their claim of error with respect to arguments made during HTI's closing.

**Plain Error Review**

■■■ At best, therefore, Appellants' first point on appeal is entitled to plain error review. "Plain errors affecting substantial rights may be considered on appeal, in the discretion of the court ... when the court finds that manifest injustice or miscarriage of justice has resulted therefrom." Rule 84.13(c). "Plain error is evident, obvious, and clear error." *Estate of Werner,* 133 S.W.3d 108, 111 (Mo.App. W.D.2004).

■■■ We conclude that Appellants' claim of error in its first point on appeal is not entitled to plain error review for three reasons: (i) because the jury was properly instructed, according to Appellants, and we assume the jury followed the instructions; (ii) because PCI's and HTI's arguments during closing were invited by Appellants' evidence and argument; and (iii) because the arguments about which Appellants complain were fair comment on an element instructed other than PCI's or HTI's duty of care.

**(i) The jury was properly instructed**

■■■■■ First, we observe that as a general principle, "[e]ven if counsel misstates the law in closing argument, if the circuit court properly instructs the jury, then manifest injustice or a miscarriage of justice generally will not be found." *Peters,* 292 S.W.3d at 392 (citing *State v. Edwards,* 116 S.W.3d 511, 537 (Mo. banc 2003); *State v. Parker,* 886 S.W.2d 908, 926 (Mo. banc 1994)). Here, the verdict directors were submitted by the Appellants, and, according to Appellants, those verdict directors correctly instructed the law.[5] [Appellants' Brief, pp. 28–30]. "The jury is bound to follow the trial court's instructions and we presume that it will even to the extent that doing so might require the jury to ignore specific argument of counsel in conflict." *Graves v. Atchison–Holt Elec. Coop.,* 886 S.W.2d 1, 4 (Mo.App. W.D.1994). There is no plain error.

**(ii) PCI's and HTI's arguments during closing were invited by Appellants' evidence and argument**

Second, PCI's and HTI's arguments responded to Appellants' evidence and argument.

---

**5.** We express no opinion as to whether the verdict directors in this case correctly in- structed the jury.

During Appellants' opening statement, Appellants outlined the theme of their case on the subject of PCI's and HTI's negligence and repeatedly emphasized Respondents' contract obligations and whether those obligations had been performed:

We will show you that [PCI and HTI] failed to install the traffic control devices that were required by their contracts.

. . . .

[PCI and HTI] violated the traffic control plan that both of the defendants had agreed and contracted to implement. [They] also violated the Manual on Uniform Traffic Control Devices.

. . . .

PCI's contract with the State required them to follow a written traffic control plan that had been developed by [MHTC's] own traffic engineers. PCI will tell you they had to follow that traffic control plan. They also had to follow certain specifications and job-special [sic] provision for the traffic control that were included in that contract. All of these requirements were set out in writing and you will see them throughout this trial. PCI agreed to follow all of those and that they would get $4.4 million if they performed that work.

. . . .

You will hear evidence and it is undisputed that [HTI] was obligated and required to comply with the contract that PCI had with the State and to follow the traffic control plan that had been developed for this project long before it even got started.

. . . .

In fact, our own traffic control safety expert . . . will testify that the written traffic control plan that [MHTC] engineers had designed for this bridge was perfectly acceptable and it was perfectly safe. The problem was that PCI and

[HTI] didn't set it up like they were supposed to.

. . . .

The evidence will show . . . that two months before this accident took place, PCI went to [MHTC] and asked to be able to open up the front of those concrete barriers that had previously closed off the work spaces and the hole.

. . . .

So the evidence will show that this change to the traffic control plan as set forth in this [MHTC] memo became the new traffic control plan for this bridge. And that was two months before this accident happened and it was what HTI and PCI were supposed to do.

Instead, you will hear and see evidence that PCI and HTI did nothing that [MHTC] told them to do.

Though Appellants' opening statement was not evidence, the record reveals that Appellants proceeded to put on evidence during their case-in-chief precisely as they promised the jury they would.

For example, Appellants' traffic control safety expert discussed in detail what MHTC's plans and specifications required of PCI and HTI, how the modification of the traffic control plan was documented, and whether PCI's and HTI's work conformed to the plans and specifications as modified. The traffic control safety expert's testimony culminated with the following opinions:

Q: [By Appellants' counsel] Do you have an opinion whether or not the proposed modifications to the traffic control plan for Job 971 that you discussed with the jury from the [MHTC] memo was appropriate for that work area?

A: The modifications that were—that were asked for? Q: That were discussed by the [MHTC] personnel.

A: Yeah, they were—they were—it was appropriate. I wouldn't have a problem with that.

Q: Okay. Did you form any conclusions as to whether or not PCI and HTI complied with the modified plan for the traffic control plan at Job 971?

A: Yes.

Q: And what's your conclusion?

A: PCI didn't comply with even the initial plan, never mind the modified plan, and neither did HTI. You can see the significant difference from what was in place to what was actually required by contract, by plans, by specs, and by agreement that PCI had with [MHTC].

In their closing argument, Appellants argued, among other things, as follows:

There is no way that accident would have happened if those levels of protection had been put in place and if PCI had just followed the written traffic control plans that they bid on, that they got paid to put in place, that they agreed to months before the accident ever happened.

Appellants also argued that:

... PCI took a traffic control plan that completely closed off that work space and that hole with multiple levels of protection ... A very safe traffic control plan that was designed [by MHTC], we have never had any problem with that written traffic control plan that [MHTC's] engineers designed. If PCI had put that in place and that had been there when [Tiffany] was driving across the bridge ... you ask yourself if you think you would be here today.... The problem was PCI wanted to change it. They wanted to do something different.... In the middle of this project, they decided it was inconvenient for them ... So what they do is they ask [MHTC] to [agree to modify] what was otherwise a perfectly safe plan.

The apparent theory of Appellants' case was that Respondents negligently requested and secured approval for a modification to the original traffic control plan and/or negligently failed to follow the modified traffic control plan. Regardless which theory Appellants intended, Appellants consistently tied their claim of negligence to what MHTC's traffic control plans required and to whether those plans were followed.

In response, Respondents elicited contrary testimony regarding their compliance with the requirements imposed by MHTC's plans and specifications. All of this evidence was admitted *without objection.* For example, Scotty Williams, a resident engineer with MHTC, testified during direct examination by PCI:

Q: [PCI's counsel] And then if—once the [traffic control] plan is set up ... what do inspectors do?

A: They monitored the work zone just to make sure that it was still-remained in compliance from day to day.

Q: And they would do that how frequently?

A: Usually once a day.

Q: And was there ever any problem that you are aware of that the temporary traffic control plan on U.S. 36 was not in compliance with what [MHTC] wanted on this project?

A: .... I'm unaware of any major issues involving the traffic control on [971] project.

 ....

Q: [W]hat was your impression generally of this particular project as far as complying with the temporary traffic control plan as designed and implemented by [MHTC] on the project?

A: Typically we didn't have any issues.

On redirect, the same witness was permitted to testify, without objection, as follows:

> Q: [PCI's counsel] [D]id PCI comply with the temporary traffic control plan as designed and implemented by MHTC as of ... [the day of the accident]?
> A: It was—the plan that was imposed on the west—east end of the project was brought forth to the 971 job when we changed our phasing throughout the project, yes.
> Q: All right. And that was the plan that was to be used on the 971 project, is that correct?
> A: That's the plan that we chose to use, yes. Q: And PCI complied with that plan? A: Yes.
>
> ....
>
> Q: Did PCI's work on this project comply with all of the [MHTC] plans and specifications?
> A: Yes, it did.

PCI's traffic control expert testified without objection that it was his opinion that the modified traffic control plan was "adequate and complied with the Manual on Uniform Traffic Control Devices." He also testified without objection that PCI "complied with the temporary traffic control plan as designed and implemented by [MHTC]." When cross-examined by HTI's counsel, this witness testified, without objection that HTI "complied with plans developed by [MHTC] for setting up temporary traffic control for [this] project."

In HTI's case-in-chief, its traffic control safety expert testified, without objection, that MHTC's approval was required for any changes to the traffic control plan, and that HTI "did all that [MHTC] and [PCI] asked them to do."

Appellants' complaint about Respondents' closing arguments thus disregards the evidence. It is readily apparent that Respondents' closing arguments commented on the evidence. We have already observed that a trial court is afforded wide latitude in closing argument regarding the arguing of facts and *inferences drawn from the evidence.* *Warren Davis Props.,* 111 S.W.3d at 527. "[T]he permissible field of argument is broad, and so long as counsel *does not go beyond the evidence and the issues drawn by the instructions, or urge prejudicial matters or a claim or defense which the evidence and issues drawn by the instructions do not justify,* he is permitted wide latitude in his comments." *Heshion Motors,* 600 S.W.2d at 534 (emphasis added).

Moreover, "a party will not be heard to complain of alleged error in which, by his own conduct at the trial, he joined or acquiesced.'" *Rouse v. Cuvelier,* 363 S.W.3d 406, 416 n. 6 (Mo.App. W.D. 2012) (quoting *Taylor v. Cleveland, C.C. & St. L. Ry. Co.,* 333 Mo. 650, 63 S.W.2d 69, 75 (1933) (holding that under the invited error rule, where a plaintiff is the first to inject a complained of issue into evidence before the jury, the party is estopped from complaining of error)). By the time the objection to PCI's closing argument was raised, the "error" about which Appellants complain was cumulative to other related evidence. "'A complaining party is not entitled to assert prejudice if the challenged evidence is cumulative to other related admitted evidence.'" *Id.* at 416 (quoting *Saint Louis Univ. v. Geary,* 321 S.W.3d 282, 292 (Mo. banc 2009)).

There is no plain error here.

**(iii) The arguments about which Appellants complain were fair comment on an element instructed other than PCI's or HTI's duty of care, whether Respondents acted as ordinary, reasonable, prudent persons**

Finally, the trial court ruled that PCI's closing argument was relevant to whether

PCI acted as an ordinary, reasonable, prudent person. The verdict directors required the jury to determine whether, in failing *either* to barricade or cover the hole in the bridge *or* to provide traffic controls sufficient to direct motorists around the hole, the Respondents were negligent— *i.e.*, they failed to act as an ordinary, reasonable, prudent person. A plain reading of the excerpted portions of PCI's closing, set forth *supra*, reflects that PCI argued its compliance with MHTC's contract requirements was all that should be expected of an ordinary, reasonable, prudent person—a position not at all inconsistent with the instructions or Appellants' evidence impugning Respondents for their failure to perform their work in accordance with the modified traffic control plan. If a complained of argument during closing is within the purview of a matter to be determined by the jury as it has been instructed, the argument is not a misstatement of the law. *Heshion Motors,* 600 S.W.2d at 534. Given the evidence and the instructions in this case, we cannot conclude that a manifest injustice or miscarriage of justice occurred by virtue of the trial court's ruling. Again, there is no plain error.

■ In so concluding, we are aware that the law with respect to the duty owed by a road contractor under contract with MHTC to maintain a safe construction zone is unsettled. As this court observed in *Harlan v. APAC–Missouri, Inc.,* 360 S.W.3d 826 (Mo.App. W.D.2011), there is a conflict among Missouri appellate cases as to the proper articulation of that duty. In *Beyerbach v. Girardeau Contractors, Inc.,* 868 S.W.2d 163, 167 (Mo.App. E.D.1994), our Eastern District concluded in a construction work zone accident case that "where a servant obeys the orders of his master without negligence, the servant will

not be liable for injury to third persons *unless he knew, or had reason to believe, that such actions were dangerous and likely to cause injury to a third party."* (Emphasis added.) *See also Casey v. Florence Const. Co.,* 939 S.W.2d 36, 38 (Mo.App. W.D.1997). As we pointed out in *Harlan,* "[n]either *Beyerbach* nor *Casey* mentioned existing case law holding that the fact that a contractor performed the construction work in compliance with MHTC plans and specifications does not serve to insulate the contractor from liability in negligence." 360 S.W.3d at 829 (citing *Dick v. Scott Const. Co.,* 539 S.W.2d 688, 692 (Mo.App. E.D.1976)). We went on to observe that:

> "[H]ighway contractors have a continuing and non-delegable duty to exercise reasonable care for the safety of the public using the highway." *Swindell v. J.A. Tobin Const. Co.,* 629 S.W.2d 536, 541 (Mo.App. W.D.1981). "The primary duty to exercise reasonable care for the safety of the general public using a road or highway during improvements or repair rests on the road contractor, and the road contractor in this respect must act reasonably and with due regard to the rights of persons lawfully using the way and is liable for injuries resulting from negligence in the performance of his work." *Best v. Fred Weber Const. Co.,* 525 S.W.2d 102, 108 (Mo.App. E.D. 1975). "The liability, aforesaid, is imposed upon the road contractor not by virtue of his contract with a public authority, or upon failure to perform the work in accord with a contract, but upon the tortious breach of duty imposed upon the contractor by common law." *Id.*

*Harlan,* 360 S.W.3d at 829.[6]

■ The critical point of difference between *Beyerbach* and the contrary cases

---

6. Though we noted the conflict in authority in *Harlan,* we did not resolve it, as the evidence

cited in *Harlan* centers on the legal relationship of the highway owner and the road contractor, and the source of any duty owed. *Beyerbach* presumed that relationship to be one of master/servant, a designation synonymous with an "employer/employee" relationship. *See, e.g., Graczak v. City of St. Louis*, 356 Mo. 536, 202 S.W.2d 775 (1947); *Funk v. Fulton Iron Works Co.*, 311 Mo. 77, 277 S.W. 566 (1925). As such, consistent with the doctrine of *respondeat superior*, *Beyerbach* concluded that an "employee" road contractor has a complete defense to liability if the contractor has done all that was asked of it by its "employer" *unless* evidence suggests the contractor knew or had reason to believe there was a dangerous condition likely to cause injury to third persons. In contrast, *Harlan* observed that *Swindell* and *Best* do not rely on *respondeat superior* liability but instead treat roadway contractors as independent contractors possessing a "non-delegable duty" to exercise reasonable care in protecting third persons from injury in a construction work zone. *See, e.g., Bowles v.*

*Weld Tire & Wheel, Inc.*, 41 S.W.3d 18, 23 (Mo.App. W.D.2001) (recognizing that generally landowner is not vicariously liable for negligence of independent contractor unless independent contractor has been retained to perform inherently dangerous work). This non-delegable duty is determined not as a function of contract requirements but instead as a function of common law.[7] *Best*, 525 S.W.2d at 108.

We are inclined to conclude that *Beyerbach* holds little, if any, continued relevance, absent a scenario where the relationship between a highway owner and a road contractor is demonstrated to be one of "master/servant" and not "independent contractor."[8] *See, e.g., Sw. Bell Tel. Co. v. Rawlings Mfg. Co.*, 359 S.W.2d 393, 398 (Mo.App.1962) (discussing whether relationship of master/servant or independent contractor existed as determinative of whether landowner owed a duty). Here, the evidence was uncontested that the relationship between MHTC and PCI/HTI was not that of master/servant, but was that of independent contractor. Thus, we

in that case permitted us to affirm the jury's verdict under both lines of case as even under *Beyerbach*, compliance with contract requirements will not shield a road contractor from liability if the contractor knew, or had reason to believe, that its traffic controls were dangerous or likely to cause injury to third parties. 360 S.W.3d at 829.

7. There appears to be a marked distinction in the law regarding the duty owed by a roadway contractor depending on whether the injury giving rise to suit occurs while the roadway contractor is performing work on the roadway or after the work is complete and accepted. *See generally* 40 C.J.S. *Highways* section 337 (2006). In the latter scenario, it is generally recognized that where an accident occurs on a completed highway project that a contractor did not design, the contractor will not be liable for a claimed design defect if the contractor performed its work in a non-negligent manner in accordance with provided plans and specifications. *Id.*

8. The Restatement (Second) Of Torts uses the terms "master/servant" and independent contractor, defining "independent contractor" as "any person who does work for another under conditions which are not sufficient to make him a servant of the other." Section 409 cmt. a (1965). The now superseded Restatement (Second) of Agency used the same terms, noting an agent may be either an independent contractor or a servant-rendering determination of the proper nomenclature factual in nature. Section 2 cmt. b (1958). The Restatement (Third) of Agency abandons the term "independent contractor" in lieu of the terms "employee" and "non-agent service provider." *See* section 1.01 cmt. c (2006). The Restatement (Third) of Agency section 7.07(3)(a) (2006) defines an employee, for purposes of vicarious liability, as "an agent whose principal controls or has the right to control the manner and means of the agent's performance of work."

accept, *arguendo,* Appellants' contention that *Beyerbach* has no application to this case.

However, our agreement with Appellants on the applicable law is of little solace. Appellants claim that the trial court permitted Respondents to argue that their duty to Appellants was limited by their contract—*i.e.,* the *Beyerbach* defense. Appellants contend that Respondents were thus permitted to urge a "false duty of care." The fallacy in Appellants' argument is that although *Swindell* and *Best* do not permit contract requirements to define the duty owed, and do not permit contract performance to serve as an absolute defense to liability, those cases do not negate the relevance of such evidence to prove or disprove other material matters in dispute. Certainly, Appellants must understand that to be the case, as they devoted considerable effort to establishing Respondents' contract requirements and whether those requirements were performed.

▮ Here, the jury instructions did not define the Respondents' duty by reference to their contract requirements. And the jury instructions did not submit as an affirmative defense that the Respondents performed their contract requirements. The instructions did, however, require the jury to determine whether Respondents were negligent—*i.e.,* to determine whether the Respondents failed to act as ordinary, reasonable, prudent persons—if the jury found that Respondents either failed to

cover the hole or to sufficiently barricade the hole. The trial court concluded that PCI's arguments were relevant to this contested element of the verdict directors. We do not see that the trial court's assessment is a manifest injustice, particularly in light of the evidence introduced on the same subject by Appellants.[9]

In fact, this record indicates that the trial court agreed with Appellants that *Beyerbach* was not controlling, lending credence to our conclusion that the trial court reasonably concluded that PCI's closing arguments were properly restrained to whether PCI acted as an ordinary, reasonable, prudent person. Appellants first raised the *Beyerbach/Harlan* conflict when they filed a motion in limine on the morning of the fourth day of trial, near the completion of their case in chief. The motion sought to preclude PCI and HTI from relying on a ***defense***[10] that they were "just following orders," or "just [doing] what [MHTC] told us to do." By that time, ***all*** of Appellants' liability evidence had been admitted, including the testimony of their traffic control safety expert summarized above. Appellants had thus already injected MHTC's contract requirements, and whether PCI and HTI had complied with those requirements, as somehow relevant on the issue of PCI's and HTI's "negligence."

The trial court responded to the motion in limine noting:

In my opinion it's going to be an issue perhaps on argument to the jury with

---

9. We do caution that in cases asserting negligence by roadway contractors in failing to maintain a safe construction work zone, the admission of any evidence or argument on the subject of contract requirements or contract performance must be carefully scrutinized and tailored to prevent improper consideration of such evidence on the issue of the duty owed by the contractor or as a veiled affirmative defense to liability. The trial court's duty

in this regard will not be as difficult as it might otherwise be, however, when, as here, a plaintiff elects to establish negligence by reference, in whole or in part, to a roadway contractor's contract requirements and performance of those contract requirements.

10. No such affirmative defense was instructed in this case.

regard to the—what they can and can't do.... I think it's certainly relevant with the interaction of [MHTC] and the defendants and their talk about the temporary traffic control plan and the changes with regards to it and approval or non-approval of what was changed. So that's part of it. So I'm thinking the evidence is going to be allowed, but I don't know about argument because I— that's not going to be part of the verdict director as I see it.

The trial court thus recognized that Respondents could not argue that compliance with MHTC's plans and specifications constituted an absolute defense to Appellants' claim of negligence. The trial court also recognized, however, that there might be a relevant context for arguing contract compliance consistent with the evidence, the instructions, and the law.

■ Consistently, during the jury instruction conference, the trial court agreed with Appellants that the verdict directors could not frame PCI's and HTI's duty in terms of whether they obeyed MHTC's directives, rejecting Respondents' contention that *Beyerbach* controlled. The trial court observed:

[T]he plaintiffs have made a submissible case. And I reviewed all this last night that—the theory of the plaintiffs is that ... HTI and PCI both knew or had

reason to know that the temporary traffic control plan as implemented was dangerous and likely to cause injury, especially for someone trying to exit onto I–229, which is what [Tiffany] did.

And you're going to get up and say [Tiffany] was the sole cause of it, she wasn't attentive, she drove over behind the barrier, which you're free to argue. And I suppose you can argue that—... "[MHTC] approved what we did and so it was fine with us."

So the jury will sort through all those facts and determine whether or not they believe that you were negligent in the way you operated the work zone and what you did in the temporary traffic control plan, both you and HTI.

The trial court thus anticipated that PCI and HTI might be able to argue that they did all that they thought was necessary, not as a defense to Appellants' claims, but instead on the issue of whether they acted reasonably.[11]

■ In light of the foregoing, it was not a manifest injustice or a miscarriage of justice to permit Respondents to argue that they acted as ordinary and prudent persons by doing only what was asked of them by contract.[12]

Point One is denied.

11. Based on the trial court's ruling on the motion in limine and its discussion during the instruction conference, Appellants were aware before Respondents began their cases-in-chief and their closing arguments that the trial court believed that Respondents could not argue compliance with MHTC's contract as an absolute defense to liability, but might be able to argue compliance with the contract for some other relevant purpose, depending on the evidence. Despite this advance notice, Appellants never objected (as we have noted) to any of the potentially offending testimony offered through Respondents' cases-in-chief and did not timely object during Respondents' closing arguments. After the denial of a mo-

tion in limine, an objection must be made at the time evidence is received to preserve any claim of error associated with admission of the evidence for appellate review. *Anderson v. Rojanasathit*, 714 S.W.2d 894, 895 (Mo. App. E.D.1986).

12. In fact, in light of our discussion, we can comfortably state that even had Appellants been afforded full appellate review of the unpreserved claim of error raised in their first point on appeal, we would reach the conclusion that the trial court did not abuse its discretion in overruling Appellants' objection to the Respondents' closing arguments. There is no indication here that error oc-

## Point Two

In Appellants' second point, they claim the trial court erroneously sustained a hearsay objection to the attempt to introduce a statement made by PCI's foreman to Janet's brother-in-law, Roger, because the statement was an admission against PCI's interests. We disagree.

### *Standard of Review*

A trial court "enjoys considerable discretion in the admission or exclusion of evidence, and, absent clear abuse of discretion, its actions will not be grounds for reversal." *Moore v. Ford Motor Co.,* 332 S.W.3d 749, 756 (Mo. banc 2011) (internal quotation marks omitted). "On appeal, we presume that rulings within the discretion of the trial court are correct and the appellant bears the burden of showing that the trial court abused its discretion." *Skay v. St. Louis Parking Co.,* 130 S.W.3d 22, 26 (Mo.App. E.D.2004). An improper admission or exclusion of hearsay evidence requires reversal only if the trial court's ruling results in prejudice. *Klotz v. St. Anthony's Med. Ctr.,* 311 S.W.3d 752, 763 (Mo. banc 2010). Error is not prejudicial "unless there is a reasonable probability that the trial court's error affected the outcome of the trial." *Elliott v. State,* 215 S.W.3d 88, 93 (Mo. banc 2007).

### *Analysis*

During Roger's direct examination, the trial court sustained PCI's hearsay objection when Roger sought to testify about a conversation he had with an unidentified man the day following the accident on the bridge where the accident occurred. Roger described a pick-up truck that looked like a construction truck, and said a person he believed to be associated with the truck picked up a set of keys off the ground that said "police" on them. Roger offered to take the keys to return them to a friend on the police force. When Roger attempted to testify about the man's response, the hearsay objection was made and sustained.

Counsel for the Appellants explained out of the hearing of the jury that the anticipated testimony could be woven together with job diaries to identify the speaker as a PCI foreman by the name of Kenny Katz. PCI acknowledged it had an employee by that name but refuted that foundation had been laid to indicate Katz was the person to whom Roger had been talking. Appellants' counsel made an offer of proof. In that offer of proof, Roger testified that the person said he wanted to take the keys to the police himself "because I'm tired of people driving through my concrete." Roger said the man told him that "he had three or four cases of people driving through the concrete." The trial court observed that it had not been established that the concrete issues referred to by the man involved the bridge in question, as PCI was working on six different bridge spans as a part of its MHTC contract, or that the person with whom Roger spoke was Katz.

Later, after the relevant job diaries were admitted, the request to permit Roger to testify about the statement was renewed. The job diaries suggested that it was Katz who found a set of keys on the bridge the morning after the accident. Appellants argued that Katz's statement to Roger, though hearsay, fell into the exception for admissions against a party opponent. Appellant argued Katz's statement was relevant to establish PCI's notice that its traffic controls were not keeping motorists out of the work zone.

curred, or that if it occurred, it had a decisive effect on the jury's determination. *State ex rel. State Highway Comm'n v. Thurman,* 428 S.W.2d 955 (Mo.App.1968).

The trial court again sustained PCI's hearsay objection. The trial court held:

I've arrived at the conclusion that the statements of an agent or employee may be received into evidence against the principal as admissions if the statements are relevant to the issues in the case and if the agent, in making the statements, was acting within the scope of his authority.

As I understand the facts of this case, Kenny Katz is talking to [Roger], who was out there taking pictures, and made these statements allegedly to [Roger] about someone driving through his concrete.

My issue is that I don't see that as acting within the scope of his authority. I think he has the authority to give an admission on behalf of the defendant. But he's not doing anything for his job in talking to [Roger]. He's not acting within the scope of his authority. He's just talking to a guy that's taking pictures out there on the bridge. And I don't see that as qualifying as admission.

In their point relied on, Appellants claim the trial court's ruling was erroneous because Katz was acting in the scope of his employment.

▪ In *Bynote v. National Super Markets, Inc.*, 891 S.W.2d 117 (Mo. banc 1995), our Supreme Court clarified the standard for admission of hearsay under the exception for an admission against the interests of a party opponent. An admission of an employee is admissible against the interests of his employer if the statement is relevant to the issues involved and the employee, in making the admission, was acting within the scope of his authority. *Id.* at 124. In *Bynote*, the Supreme Court found that statements by two uniformed grocery store employees, a checker and a bagger, about whether one had told the other to clean up water from the floor were admissible admissions against interest. *Id.* It reached this conclusion because the evidence established that the checker's duties included telling the bagger to clean up a spill if she saw one, and the bagger's duties included the obligation to clean up a spill if directed. *Id.*

In *Skay*, an individual slipped and fell on ice in a parking garage. 130 S.W.3d at 24. A witness was prepared to testify that she later spoke with an employee of the parking garage who told her, after hearing of the injury, that "he had forgotten to turn off the sprinklers and that he had made a mistake." *Id.* at 25. The Eastern District concluded that there was no evidence that the scope of the employee's duties included any obligation "to turn off the sprinklers." *Id.* at 27. "Therefore the purported admission was not made within the scope of [the employee's] duties and it was not admissible as an admission of a party opponent." *Id.*

▪ *Bynote* and *Skay* instruct that it is the subject matter of an employee's statement, and not the relationship with the person who overhears the statement or the circumstances giving rise to the conversation, which must be within the scope of the employee's duties.[13] Applied here, Appellants were required to lay foundation that

---

13. The trial court incorrectly focused its concern on the circumstances of Katz and Roger having a conversation, instead of on the subject of Katz's statement. However, because we ultimately conclude that the trial court correctly held that insufficient foundation had been laid to establish that Katz's statement was within the scope of his employment, the trial court's mistaken focus is immaterial. *See Portis v. Greenhaw*, 38 S.W.3d 436, 447 (Mo.App. W.D.2001) ("If any ground exists for excluding the evidence, we will uphold the trial court's decision to exclude it.... [W]e are not bound by ... the trial court's reasons for refuting the evidence....").

the scope of Katz's duties in his employment with PCI included the obligation to communicate with the police that motorists were driving in "his" concrete. There was virtually no evidence in the record about Katz's actual job duties as a job foreman for PCI. Certainly, there is no evidence in the record that communicating with the police or other individuals about motorists driving through concrete was within the scope of Katz's duties.[14] We cannot conclude that the trial court abused its discretion by holding that Appellants failed to establish that Katz's statement to Roger regarded a subject that was within the scope of his employment.

 Even were we to conclude that Katz's position as a job foreman should be presumed to include the duty to communicate to police his concerns about motorists driving through "his" concrete, we would not find exclusion of the statement to warrant reversal. As the trial court noted, there was no evidence that the concrete concerns about which Katz complained implicated the work zone where the accident occurred. That foundation concern was never resolved, calling the logical relevance of the evidence into question. "Evidence is relevant if it logically tends to prove or disprove a fact in issue." *State ex rel. Mo. Highways & Transp. Comm'n v. Greenwood*, 269 S.W.3d 449, 457 (Mo. App. W.D.2008) (internal quotation marks omitted). Here, Katz's statement was being offered to show that PCI had notice that the traffic controls in place on the bridge where Tiffany's accident occurred were inadequate to prevent a motorist from entering the work zone. Not only was there no evidence that the concrete incidents occurred on the bridge in ques-

tion, there was no evidence of fresh concrete in the work zone where the accident occurred. Nor was there any indication that the incidents about which Katz was concerned occurred with identical traffic measures in place. We have good reason to suspect, therefore, that Katz's statement was otherwise permissibly excluded, as insufficient foundation was laid to insure the statement's logical relevance.

We also note that after refusing to permit Roger to testify about Katz's statement, the trial court suggested that Appellants subpoena Katz to testify. PCI agreed to accept a subpoena for Katz. Appellants elected not to call Katz as a witness, inapposite to their current contention that Katz's statement was so material that they were prejudiced by its exclusion.

The trial court's exclusion of Roger's testimony about Katz's purported statement was neither erroneous nor prejudicial.

Point Two is denied.

## Conclusion

The trial court's judgment is affirmed.

All concur.

---

14. We are handicapped by the fact that the testimony of several witnesses was presented by videotaped deposition. The trial transcript does not set forth the testimony elicited in these depositions, and the deposition transcripts have not been made a part of the record on appeal.